**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRCIRT OF NORTH CAROLINA**

-------------------------------------------------------------------------------X

JOSEPH JEMSEK M.D.

Plaintiff

Case #

-against-

**VERIFIED COMPLAINT FOR ANTIRUST INJUNCTION AND DECLARATORY RELIEF.**

North Carolina Medical Board, Janelle R. Rhyne, M.D.,
individually and in her official capacity as past member of the Board;
Robert Moffatt M.D., individually and in his official capacity as past
member of the Board; H. Arthur McCulloch M.D. , individually and
in his official capacity as past member of the Board; Aloisius P. Walsh,
individually and in his official capacity as past member of the
Board; E.K. Fretweel, Ph.D., individually and in his official capacity
as past member of the Board; Michael E. Norins, M.D. individually
and in his official capacity as past member of the Board; George L.
Saunders III, M.D. individually and in his official capacity as past
member of the Board; Sarvaresh Sathiraju M.D.    individually and
in his official capacity as past member of the Board; Dicky S. Walia,
individually and in his official capacity as past member of the Board;
Ralph Loomis, M.D. individually and in his official capacity as past
member of the Board; Don Jablonski M.D. individually and in his
official capacity as past member of the Board; Cheryl Walker-McGill,
MD; individually and in her official capacity as a member of the Board;
Pascal Udekwu, MD individually and in his official capacity as a member
of the Board; Helen Diane Meelheim, FNP-BC, individually and
in her official capacity as a member of the Board; Subhash C. Gumber, MD,
PhD, individually and in his official capacity as a member of the Board;
Timothy E. Lietz, MD - individually and in his official capacity as a member
of the Board;    Debra A. Bolick, MD, individually and in her official capacity as
a member of the Board; Eleanor E. Greene, MD individually and in her
official capacity as a member of the Board; Barbara E. Walker, DO,
individually and in her official capacity as a member of the Board;
A. Wayne Holloman - Public Member individually and in her
official capacity as a member of the Board; Michael J. Arnold, MBA
individually and in his official capacity as member of the Board;
Bryant A. Murphy, M.D., MBA individually and in his official capacity
as member of the Board; Ralph A. Walker LLB, JD individually and
in his official capacity as member of the Board.

Defendants.

-------------------------------------------------------------------------------X

1

COMES NOW the Plaintiff Joseph Jemsek M.D. by his undersigned attorneys and complains against the defendants as follows:

## BACKGROUND, CASE SYNOPSIS, AND SUMMARY OF RELIEF SOUGHT.

### (i).    Case synopsis.

1.    Beginning on or about June 9, 2014, and on a continuous basis subsequently thereafter through the date of this complaint, the Plaintiff learned and continues to learn the follows: (a) since 2005 the defendants acted and continue to act in conspiracy with each other to violate 15 USC Sec. 1 et.seq. by perpetrating and continuing to perpetrate the acts described in this complaint in order to impose an unreasonable restraint on Plaintiff's trade and on competitive medical services rendered in North Carolina to Lyme disease patients from other states and from international destitinations; (ii) defendants' acts as alleged in this complaint are aimed at creating a monopoly in violation of 15 U.S.C. Sec. 2 and are further aimed at the price fixing of medical services rendered in North Carolina to Lyme patients in violation of 15 U.S.C. Sec. 1 et.seq.

2.    Specifically, on or about June 9, 2014 the Plaintiff has learned for the first time from official court papers in the form of an affidavit of the defendant Janelle Rhyne M.D. that the defendants made and continue to make use of their official capacities as past and present members of the Board   to conspire with each other on a continuous basis since 2005 to unreasonably restrict Plaintiff's trade and practice of medicine: (a)    for their own financial gain, trade advantage and benefit; (b) for the financial gain, trade advantage and benefit of the group of physicians who offer Lyme related medical services in accordance with the restrictive guidelines of the private organization known as the Infectious Disease Society of America ("IDSA") and (c) for the financial gain and trade advantage of the non-party insurer Blue cross Blue Shield of North Carolina ("BCBSNC"); (4) for the financial gain, trade advantage and benefit of the group of

2

physicians who offer Lyme related medical services in accordance with the restrictive guidelines of BCBSNC.

3.      Upon information and belief, the conspiracy to violate 15 USC Sec 1 et.seq. was initiated by the past Board members. Said defendants implemented a methodical plan which was consummated by them from 2005 throughout 2008 in furtherance of the conspiracy. The aim was to perpetually shut down Plaintiff's business which was in competition or potentially in competition with defendants' own and with that of BCBSNC. The foregoing conspiracy and plan to violate 15 USC Sec. 1 et.seq. is being and will continue to be perpetuated by the present members of the Board who enforce and will continue to enforce the restraints of trade initially placed upon the Plaintiff by the initial members of the Board. The present members of the Board conspired and will continue to conspire with each other and with the former members of the Board to violate 15 USC Sec. 1 et.seq.

4.      The plan and the conspiracy to violate 15 USC Sec. 1 et.seq. involved and continues to involve the invocation of staged state medical disciplinary investigations and orchestrated disciplinary proceedings conducted under the color of the North Carolina Administrative Procedure Act (hereinafter "APA"). The conspiracy generated a staged and tainted official Board Order dated August 21, 2006 (Exhibit "A" hereto) which perpetually restricted Plaintiff's trade by imposing specific restrictions on the type of competitive Lyme disease related medical services offered to chronically ill patients.

5.      The conspiracy to violate 15 USC Sec. 1 et.seq. was subsequently furthered by additional acts of the past Board defendants which coerced the Plaintiff into placing his medical license on inactive status and abandon his practice of medicine in North Carolina. Those acts included intimidation through messages relayed to the Plaintiff by Board investigators to the

3

Plaintiff relaying that he will not be further disciplined for treating Lyme through competitive services if he simply left North Carolina and abandoned his license to practice medicine in that state by placing it on "inactive" status.

6.     The conspiracy was also furthered by the issuance of a purported "letter of concern" of June 23, 2008 (Exhibit "B" hereto). Said letter pertained to the restriction of the competitive Lyme disease related services offered by the Plaintiff. The services conflicted with defendant's own business interests and with the conspiracy scheme aimed at buttressing defendants' financial bottom line as well as that of the insurer BCBSNC.

7.     The conspiracy to violate 15 USC Sec. 1 et.seq. was, is and will be in the future carried out by the present Board member defendants through the perpetual enforcement of unreasonable trade restrictions imposed by the past Board members upon the Plaintiff as set forth below.

8.     While the past Board members  commenced and initially implemented the conspiracy to violate 15 USC Sec. 1, as set forth below in this complaint, the present members of the Board conspired and continue to conspire with each other and with the past Board members to perpetuate the violation of 15 USC Sec. 1 et.seq. by maintaining the unreasonable restrictions of trade against the plaintiff initiated by the past members. By continuing such restrictions, the present members of the Board are engaging and continue to engage in price fixing, maintaining a monopoly and benefiting their own business as well as that of BCBSNC.

9.     The past and present members of the Board are market participants and they controlled and still control the actions of the Board. They were are and will be engaged in the practice of medicine in North Carolina and they are all licensed by the Board. The fact that the

4

past members of the Board are no longer state officials that does not vitiate their designations as market participants for the purpose of this action.

10.     The past and present members of the Board who are lay people conspired and continue to conspire with the physician members of the Board and with each other to violate 15 USC Sec. 1 et.seq. by maintaining the unreasonable restrictions of trade against the plaintiff for the purposes of engaging in price fixing, maintaining a monopoly and benefiting the business of the physician Board members, the financial interests of private physician groups as well as the financial interest and trade advantage of BCBSNC.

**(ii)     Nature of relief sought.**

11.     Plaintiff is seeking injunctive relief pursuant to 15 USC Sec. 26 enjoining the defendants, past and present members of the Board, from conspiring with each other to prospectively violate 15 USC Sec. 1 et.seq. by restraining Plaintiff's trade and practice of medicine and by engaging in price fixing, market allocation, formation of a trade monopoly and unfair trade practices through the prospective use and enforcement of the disciplinary Order of 2006 and the "letter of concern" of 2008.

12.     The Plaintiff is further seeking an affirmative mandatory injunction pursuant to 15 USC Sec. 26 enjoining the present members of the Board from maintaining of record, causing to maintain of record, enforcing or causing to be enforced the Board Order of 2006 and the "letter of concern" of 2008 on the grounds that the same amount to a violation of 15 USC Sec. 1 because: (1) the 2006 Order and the 2008 "letter of concern" illegally restrain Plaintiff's trade and practice of medicine in North Carolina as they specifically prohibit the offering and use of competitive medical services to chronic Lyme patients; (2) the Order of 2006 and "letter of concern" of 2008 form a monopoly protecting the exclusivity of the business interests and medical services of the

5

defendants, of physicians who offer Lyme related medical services by IDSA guidelines and of the non-party insurer BCBSNC; (3) the Order of 2006 and "letter of concern" of 2008 amount to horizontal and vertical market reallocation of Plaintiff's patients to the defendants and others to the extent that Lyme disease medical service are restricted to those which are practiced or potentially can be practiced by the defendants, groups of physicians following IDSA treatment guidelines applicable to Lyme disease and to those restricted by the policy of BCBSNC for the purposes of protecting its own business interests;   (4) the Order of 2006 and "letter of concern" of 2008 amount to agreements by and between the defendants co-conspirators to violate 15 USC Sec. 1 et.seq. by engaging in price fixing of Lyme related medical services in the manner set forth below in this complaint.

13.     The Plaintiff is also seeking a declaratory judgment pursuant to 28 USC Sec. 2201 declaring the acts and actions of the defendants as specified in this complaint as being in violation of 15 USC Sec. 1 et.seq.

**(iii).    The defendants are market participants. The State of North Carolina did not and does not have in place an independent state supervision mechanism overseeing the actions of the Medical Board and its members.**

14.     The defendant North Carolina Medical Board (hereinafter "Board") is an agency of the state of North Carolina

15.     The Board is a regulatory and enforcement licensing agency established under North Carolina law. The Board is charged with administering and enforcing the medical licensing regulatory system and the practice of medicine in North Carolina. The Board does not act in an advisory capacity.

16.     The Board is staffed and controlled by individuals who have financial interests in the occupation that is being regulated, namely medicine. The Board is staffed by health care

6

practitioners who are and were at all of the relevant times hereinabove and hereinafter mentioned engaged in the practice of medicine for profit in the state of North Carolina.

17.     Tt all of the times relevant to this action, a majority of the members of the Board were and are physicians licensed by the Board, and they have incentive to limit competition from other physicians who provide competitive medical services of a different type and in a different manner than the services provided by the Plaintiff.

18.     The physicians past and present members of the Board (identified below) are market participants within the meaning of the Federal Antitrust Act.

19.     A member of a state regulatory board will be considered to be an active market participant in the occupation the board regulates if such person (i) is licensed by the board or (ii) provides any service that is subject to the regulatory authority of the board. These are the past and present members of the North Carolina Medical Board.

20.     If a board member participates in any professional or occupational sub-specialty that is regulated by the board, then that board member is an active market participant for purposes of evaluating the active supervision requirement.

21.     It is no defense to antitrust scrutiny, that the board members themselves are not directly or personally affected by the challenged restraint. Even if the members of the NC Medical Board are physicians who do not offer Lyme disease related medical services their control of the medical board would nevertheless trigger the requirement for active state supervision. This is because the physicians are licensed by, and their services regulated by, the NC Medical Board. At all of the times The State of North Carolina does not have direct supervision over the action of the Board members.

7

22. Active market participants need not constitute a numerical majority of the members of a state regulatory board in order to trigger the requirement of active supervision. A decision that is controlled, either as a matter of law, procedure, or fact, by active participants in the regulated market (*e.g.*, through veto power, tradition, or practice) must be actively supervised to be eligible for the state action defense.

23. Neither the Board nor the individual past and present members of the Board have state immunity to this action because the State of North Carolina did not provide for any mechanism of active supervision of the Board's and Board members' decisions and activities.

24. The challenged restraint of trade, is a perpetual restriction of Plaintiff's professional medical license on the manner in which he provides Lyme diseases related services. This restraint of trade is articulated by the defendants in the Board's Order of 2006 (Exhibit "A" hereto) and the 2008 letter of concern (Exhibit "B" hereto) issued against the Plaintiff. The restraint of trade is not clearly articulated nor affirmatively expressed as a state policy either by statute, regulation or anything else. The state of North Carolina did not foresee or implicitly endorse the anti-competitive effect of the state agencies' and state agents' actions.

25. The restraint of trade imposed by the Board's Order of 2006 and the letter of concern of 2008 are not actively supervised by a state agency or a state official that is not a participant in the market that is being regulated. In fact the Board and its market participant members are the only entities and individuals who are empowered to maintain in place the restraints of trade which are the subject matter of this litigation.

26. The state of North Carolina does not have in place any independent supervision scheme or mechanism which oversees the actions of the Board and Board members.

8

27.     There is no existing supervisor who must review the substance of the anticompetitive decision of the Board, not merely the procedures followed to produce it; there is no supervisor who or which must have the power to veto or modify particular decisions of the Board to ensure that they accord with state policy; the 'mere potential for state supervision is not an adequate substitute for a decision by the State. There is no state supervisor over the Board and its members who or which is not an active market participant."

28.     A regulatory board, such as the Medical Board in this case, cannot issue determinations, such as the ones in the present case, which restrict the type of medical services rendered to patients suffering from Lyme disease by promoting the financial interest of one group of physicians over the other as well as personal financial interests of the Board members. Such action is not protected under the "state action" immunity against the present antitrust law suit.

29.     In the context of license disciplinary proceedings, active supervision by the state may be provided by the administrator who oversees the regulatory board (*e.g.*, the secretary of health), the state attorney general, or another state official who is not an active market participant. The active supervision requirement of the state action defense will be satisfied if the supervisor: (i) reviews the evidentiary record created by the regulatory board; (ii) supplements this evidentiary record if and as appropriate; (iii) undertakes a de novo review of the substantive merits of the proposed disciplinary action, assessing whether the proposed disciplinary action comports with the policies and standards established by the state legislature; and (iv) issues a written decision that approves, modifies, or disapproves the disciplinary action proposed by the regulatory board.

30.     No state supervision protocols over the actions of the Board and its members as articulated hereinabove exists or ever existed in the State of North Carolina at any of the relevant times hereinabove and hereinabove and hereinafter mentioned.

31.     A disciplinary decision which affects a whole segment of the medical providers in North Carolina (in this case physicians who treat Lyme disease by providing medical services similar to the provided by the Plaintiff) significantly impacts market competition.

## IDENTITY OF THE PARTIES

32.     Plaintiff Joseph Jemsek M.D. ("Plaintiff" or "Jemsek") is an individual and a physician licensed to practice medicine in the state of North Carolina under license No. 23386. Dr. Jemsek's North Carolina license is inactive.   The Plaintiff currently practices medicine in Washington D.C. He has a primary place of business at 2440 M Street N.W., Suite 205 Washington DC 20037.

33.     At all of the relevant times hereinabove and hereinafter mentioned the defendant Janelle R. Rhyne, M.D. (hereinafter "Rhyne") was and still is a physician licensed to practice medicine in North Carolina. Rhyne is currently a physician in private practice and her reported business address is c/o Cape Fear Clinic, 1605 Doctor's Circle, Wilmington, North Carolina 28401.

34.     Rhyne is named a party defendant to this action because upon information and belief she made use of her position as an appointed state official to conspire in the past, present and future with her benefactor, employer and financial business associate BCBSNC and with all of the other defendants captioned above to violate 15 USC Sec. 1 et.seq. Rhyne was and still is a market participant for the purposes of the Federal Antitrust Act.

35.     Upon information and belief, Rhyne engaged and continues to engage in conspiracies and agreements with the remaining captioned defendants in violation of 15 USC Sec. 1 et.seq. to restrain Plaintiff's practice and trade of medicine in North Carolina presently and in

10

the future. Those activities include the unreasonable restriction of Plaintiff's practice of the trade of medicine in the state of North Carolina; the price fixing of Lyme related medical services; reallocation of market share to Rhyne and the remaining of the defendants and the groups of physicians who practice by IDSA guidelines and the protection of BCBSNC's business through the use of official state action and official state process.

36. Upon information and belief the defendant Robert Moffatt M.D. ("Moffatt) was at all of the relevant times hereinabove and hereinafter mentioned and still is a physician licensed to practice medicine in the state of North Carolina. Currently Moffatt is in private practice and his reported business address is at Western Surgical Center, 29 Little Cedar Ct Asheville, NC 28805. At all of the relevant times hereinabove and hereinafter mentioned, Moffatt was the President of the North Carolina Medical Board as well as a full voting member of the same state agency in 2006. Moffat was and still is a market participant for the purposes of the Sherman Antitrust Act.

37. Moffat is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same defendants to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants

11

and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

38.     Upon information and belief the defendant H. Arthur McCulloch M.D. ("McCulloch") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina.    Upon information and belief McCulloch is in private practice and works for Southeast Anesthesiology Associates. McCulloch is not currently listed as a North Carolina license physician. His last known address is 1000 Blythe Blvd. Charlotte NC 28203.    At all of the relevant times hereinabove and hereinafter mentioned McCulloch was a voting member of the North Carolina Medical Board in 2006 and in 2008. McCulloch was and still is a market participant for the purposes of the Sherman Antitrust Act.

39.     McCullogh is made a party defendant to this action because, upon information and belief since 2005, he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same defendants to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease

12

while excluding Plaintiff's medical services from the same monopoly under the color of state action.

40.     Upon information and belief the defendant Aloisius P. Walsh ("Walsh") was at all of the relevant times hereinabove and hereinafter mentioned an individual member of the public and a member of the North Carolina Medical Board.   At all of the relevant times hereinabove and hereinafter mentioned, Walsh was a voting member of the North Carolina Medical Board in 2006.

41.     Walsh is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

42.     Upon information and belief the defendant E.K. Fretweel, Ph.D. ("Fretwell") was

at all of the relevant times hereinabove and hereinafter mentioned an individual member of the public and a member of the North Carolina Medical Board. At all of the relevant times hereinabove and hereinafter mentioned, Fretwell was a voting member of the North Carolina Medical Board in 2006.

43.     Fretwell is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

44.     Upon information and belief the defendant Michael E. Norins, M.D ("Norins") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina. Currently Norrins is in private practice and his reported business address is c/o LeBauer HealthCare, 520 North Elam Ave, Greensboro, NC 27402-6201.

14

At all of the relevant times hereinabove and hereinafter mentioned, Norins was a voting member of the North Carolina Medical Board in 2006.

45.     Norrins is made a party defendant to this action because, upon information and belief, since 2005 he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint;; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

46.     Upon information and belief the defendant George L. Saunders III, M.D. ("Saunders") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina.   Currently Saunders is in private practice and his reported business address is 602 Thomasboro Road Calabash, NC 28467. At all of the relevant times hereinabove and hereinafter mentioned, Saunders was a voting member of the North Carolina Medical Board in 2006 and in 2008.

47.     Saunders is made a party defendant to this action because, upon information and belief, since 2005 he conspired and continues to conspire with Rhyne, BCBSNC and the remaining

defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

48. Upon information and belief the defendant Sarvaresh Sathiraju M.D. ("Sathiraju") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina. Currently Sathiraju works for the department of Veterans Affairs with a reported business address at 2440 Century Place Hickory, NC 28602. At all of the relevant times hereinabove and hereinafter mentioned, Sathiraju was a voting member of the North Carolina Medical Board in 2006.

49. Sathiraju is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same defendants to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North

16

Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

50.     Upon information and belief the defendant Dicky S. Walia ("Walia") was at all of the relevant times hereinabove and hereinafter mentioned an individual member of the public and a member of the North Carolina Medical Board.   At all of the relevant times hereinabove and hereinafter mentioned, Walia was a voting member   of the North Carolina Medical Board in 2006.

51.     Walia is made a party defendant to this action because, upon information and belief,   since 2005 he conspired and continues to conspire with Rhyne,   BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this

complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

52.     Upon information and belief the defendant Ralph Loomis, M.D. ("Loomis") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina.   Upon information and belief Loomis is currently in private practice with a listed business address at Carolina Spine & Neurosurgery Center, 7 Vanderbilt Park Dr., Asheville, NC 28803.   At all of the relevant times hereinabove and hereinafter mentioned, Loomis was a voting member of the North Carolina Medical Board in 2006 and in 2008.

53.     Loomis is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne,   BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts: (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint;; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease

18

while excluding Plaintiff's medical services from the same monopoly under the color of state action.

54.     Upon information and belief the defendant   Don Jablonski M.D. ("Jablonski") was at all of the relevant times hereinabove and hereinafter mentioned a physician licensed to practice medicine in the state of North Carolina.   Upon information and belief Jablonski   is currently in   private practice with a listed business address at Country Clinic, 2 Etowah School Rd PO Box 2108 Etowah, NC 28729-1925.   At all of the relevant times hereinabove and hereinafter mentioned, Jablonski was a voting member of the North Carolina Medical Board in 2006 and in 2008.

55.     Jablonski is made a party defendant to this action because, upon information and belief, since 2005, he conspired and continues to conspire with Rhyne,   BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same defendants to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts:   (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

19

56.    The defendants Ralph Walker LLB, MD;   Cheryl Walker-McGill, MD; Pascal Udekwu, MD; Helen Diane Meelheim, FNP-BC; Subhash C. Gumber, MD, PhD;   Timothy E. Lietz, MD; Debra A. Bolick, MD;     Eleanor E. Greene, MD; Ralph A. Walker, LLB, JD; A. Wayne Holloman; Bryant A. Murphy M.D;     Michael J. Arnold, MBA (hereinafter "current Board members") are current members of the North Carolina Medical Board.

57.    The current members of the Board are made party defendants to this action because, upon information and belief, they conspired and continue to conspire with each other and with the past members of the Board identified hereinabove to violate and continue to violate 15 USC Sec. 1 et.seq. by continuing and causing to continue to be in full force and effect and enforcing and causing to enforce the Board Order of 2006 and the "letter of concern" of 2008 which impose unreasonable restraints of trade on the Plaintiff for defendants' benefit and for that of the insured BCBSNC as more particularly set forth below and above in this Complaint.

58.    The current Board members are being named party defendants to this action because, upon information and belief, they continue to conspire with Rhyne, BCBSNC and the remaining defendants named in the above caption and entered into an agreement with the same defendants to violate 15 U.S.C. Sec. 1 et.seq. by committing and continuing to commit on a continuous basis the following acts:   (a) unreasonably restrict Plaintiff's trade and the type of medical services provided to the public in North Carolina and to patients from outside of North Carolina seeking Plaintiff's medical services related to Lyme disease; (b) engage in price fixing and unreasonable restraints of trade to the detriment of the Plaintiff and that of the public while conferring financial benefit on BCBSNC, and the remaining defendants, and the group of physicians who provide medical services exclusively under the IDSA restrictive guidelines, as set forth below in this complaint; (c) form and create a monopoly for the benefit of the defendants

20

and BCBSNC to the extent that they render or have the potential of rendering medical services related to Lyme disease while excluding Plaintiff's medical services from the same monopoly under the color of state action.

## JURISDICTION.

59.     This Court has federal question subject matter jurisdiction over this matter pursuant to 28 USC Sec. 1332 because the issues which are the subject matter of this litigation arise under the statutes and laws of the United States of America, namely 15 USC Secs. 1 et.seq. Jurisdiction is also properly vested in this Court pursuant to 15 USC Sec. 4 and 15 USC Sec. 26.

## VENUE

60.     Pursuant to 28 USC Sec. 1391(b) venue is properly based in the Federal District Court for the Eastern District of North Carolina because a substantial part of the events or omissions giving rise to the claim occurred continue to occur and will occur in Raleigh, North Carolina.

## FACTUAL BACKGROUND.

**(i)     The nature of Plaintiff's practice of medicine and trade.**

61.     The Plaintiff has been involved in the practice of medicine in the state of North Carolina since 1979. In 2000 the Plaintiff founded the Jemsek Clinic in Charlotte North Carolina (hereinafter "JCNC"). At all of the relevant times hereinabove mentioned the Plaintiff was the sole shareholder and owner of JCNC. His professional license issued by the North Carolina Medical Board enabled JCNC to exist and operate.

62.     At all of the relevant times hereinabove and hereinafter mentioned the Plaintiff was and still is a physician certified by the American Board of Medical Specialties in the specialty of internal medicine and the sub specialty of infectious disease.

63.     At all of the relevant times hereinabove and hereinafter mentioned the Plaintiff practiced medicine in the state of North Carolina under license No. 23386. That license was placed on inactive status in 2007 because of the coercion and illegal unreasonable restrictions of trade exercised by the defendants upon the Plaintiff in furtherance of their conspiracy to engage in anti-competitive trade activities in violation of 15 USC Secs. 1 et.seq. as set forth below.

64.     In 2007 the Plaintiff was forced to leave the state of North Carolina and his practice of medicine by the defendants who conspired and continue to conspire to violate 15 USC Sec. 1 et.seq.

65.     At the inception of his practice of medicine the Plaintiff was primarily involved in the treatment of individuals with HIV/AIDS. The focus of his practice subsequently shifted to the treatment of individual patients who presented themselves with persistent and chronic Lyme disease.

66.     The Plaintiff began treating individuals with Lyme disease in 2001. At that time, the Plaintiff began treating chronic Lyme disease patients with long term antibiotic regiments. It became apparent to the Plaintiff that the patients presented themselves with symptoms and documented signs of Lyme disease which did not fit the model prescribed by the Infectious Disease Society of America ("IDSA"), as set forth below and that prolonged treatments were needed.

67.     The Plaintiff also diagnosed Lyme disease clinically while using antibody diagnostic testing as a reference source rather than an exclusionary diagnostic tool.   Plaintiff's

22

patients were at the time citizens and residents of states other than North Carolina as well as international citizens and residents.

68.     The Plaintiff recognized that the prescribed CDC testing methodology using the IDSA guidelines, was aimed at defining Lyme cases for surveillance reporting purposes only and were inaccurate for clinical diagnosis purposes, as the CDC itself states in its case definitions of Lyme disease.

69.     At all of the relevant times hereinabove and hereinafter mentioned, Plaintiff's diagnosis and treatment of Lyme disease in the manner described above was recognized by a group of physicians who belong to an organization called International Lyme and Associated Diseases Society ("ILADS"). In parallel with the guidelines of IDSA regarding the diagnosis and treatment of Lyme disease, ILADS had scientifically recognized guidelines pertaining to the treatment and diagnosis of Lyme disease and co infections.

70.     The IDSA guidelines do not recognize the efficacy of the treatment of Lyme with long term antibiotics beyond 28 days. Those guidelines place a time restriction element on the duration of the treatment and save money in claims paid by the insurer BCBSNC. In addition, the IDSA guidelines fall into place with the business model adopted by the past and present Board members through the issuance of the 2006 Board Order and the 2008 "letter of concern".

71.     By contrast, the ILADS guidelines for Lyme disease diagnosis and treatment recognize the existence of chronic or persistent Lyme disease and they do advocate the use of long term antibiotics in the treatment of Lyme disease beyond 28 days.

72.     The ILADS scientific  guidelines which were used by the Plaintiff to provide medical services to chronically ill Lyme patients directly conflict with defendants' business plan and model and with the restrictions sought by their health insurer payer, BCBSNC. They also

23

conflict with the trade restrictions and business monopolies sought to be imposed by the defendants for their own benefit and for the trade benefit of groups of physicians who seek to impose a monopoly on Lyme related services through the restriction of medical services to those comporting with IDSA guidelines.

73.     The IDSA guidelines regarding Lyme disease do not recognize the existence of Lyme diseases in the absence of what became known to be inadequate serological test results intended for CDC surveillance reporting criteria only.

74.     The ILADS guidelines recognize the diagnosis of Lyme disease through clinical symptoms, physical observations and examinations and medical history as well as through the interpretation of laboratory test results.

75.     Both IDSA and ILADS are private medical organizations on equal footing. They are neither state nor federal government agencies.

76.     States in endemic areas, Massachusetts, New York, Connecticut and Rhode Island enacted statutory provisions recognizing the diagnosis and treatment of Lyme by both standards and protecting physicians who practice under ILADS guidelines against state prosecution.

77.     At all of the relevant times hereinabove and hereinafter mentioned medical services related to the diagnosis and treatment Lyme disease patients which are recognized by both IDSA and ILADS standards are acceptable to the medical community who practices in that field nationwide as well as by statutory provisions in the foregoing states.

78.     At none of the relevant times hereinabove or hereinafter mentioned prior or subsequent to the issuance of the trade restrictions in the form of the 2006 Order and the 2008 letter of concern, did the Board or the State of North Carolina or any of the defendants had or have

any official policy, regulation or guideline governing the diagnosis and treatment of Lyme disease in North Carolina.

79.     Both the IDSA and the ILADS guidelines for the diagnosis and treatment of Lyme are voluntary and both associations leave it to the physicians to clinically decide which ones to apply and follow.

80.     As set forth below, the methodology of Plaintiff's diagnosis and treatment of Lyme disease admittedly became a costly proposition for BCBSNC in 2005 and an economic threat for the competing defendants past members of the Board and for groups of physicians who provide Lyme related medical services pursuant to IDSA guidelines and who sought the protection of their business and the restraint of Plaintiff's trade through Board action.

81.     In addition, the prolonged course of medical services which the Plaintiff provided and proposes to provide in North Carolina to chronically ill Lyme disease patients threatened and continues to threaten competition and the financial gains and trade benefits of the defendants and of the group of physicians who provided and provide Lyme related services in accordance with IDSA restrictive protocols.

82.     Upon information and belief all past and present physician members of the Board received and continue to receive payments from BCBSNC for medical services rendered to plan participating patients and they are and were at all of the times relevant to this complaint BCBSNC plan providers.

83.     Upon information and belief all of the past and present physician members of the Board have the ability and potential to provide Lyme disease related medical services.

84.     Whether the physician members of the Board actually provide the type of restricted Lyme disease services as proposed by the 2006 Order and the 2008 "letter of concern" is irrelevant for the purposes of them being market participants for the purposes of this action.

85.     For all of the foregoing reasons, the past and present physician members of the Board are and were at all of the times relevant to this complaint time market participants.


**(ii)     The BCBSNC connection: background of relevant facts pertaining
to defendants' conspiracy to violate 15 USC Sec. 1 et.seq.**

86.      Since the opening of JCNC, BCBSNC maintained a contractual relationship with the Plaintiff and Plaintiff's clinic, JCNC, pursuant to several provider agreements between BCBSNC and JCNC. Pursuant to the same agreements, starting in 2001 BCBSNC reimbursed JCNC for the treatment modalities which included the use of long term antibiotics for patients with persistent Lyme Disease.

87.     Prior to May 8, 2006, BCBSNC reported that it did not have a definitive medical policy pursuant to which its staff evaluated claims regarding the use of long term antibiotics to treat Lyme disease. Rather BCBSNC relied upon the general "Medical Necessity" paradigm to accept or reject such claims on a case by case basis.

88.     Consequently, before starting treatment with long term antibiotics for patients with Lyme disease covered by BCBSNC plant, Plaintiff's staff called the insurer to confirm each patient's coverage of the treatment with long term antibiotics. In nearly every case the staff was informed that BCBSNC's respective plans did not impose any restrictions on the use of IV antibiotics or courses of long term antibiotics to treat Lyme disease.

26

89.     In addition to the local plans administered by BCBSNC, the insurer also covered the treatment of federal employees treated by North Carolina physicians. Those physicians included the Plaintiff. Such coverage was provided under BCBSNC Federal Employee Plans ("FEP"). FEP plans are national plans to which BCBSNC did not apply the same policies to claims submitted by patients under the local plans.

90.     Beginning in 2003, BCBSNC employees began to internally examine claims submitted by Plaintiff's medical clinic JCNC regarding the use of long term antibiotic therapy for Lyme disease.

91.     In their examination the BCBSNC employees applied a secret and undisclosed policy used by Blue Cross Blue Shield Association ("BCBSA") on the treatment of Lyme disease when determining and denying claims related to the same.

92.     The BCBSA defined all courses of antibiotics greater than 28 days to be medically unnecessary in the treatment of Lyme disease.

93.     As a BCBSNC plan participant, the Plaintiff was never informed of the application of this policy by BCBSNC to deny claims of FEP participating patients who were treated by the Plaintiff with long term antibiotics for Lyme. To the contrary, the Plaintiff and the employees of his clinic were specifically told that no such policy existed and that the "medical necessity" paradigms applied. The provider contracts to which the Plaintiff was a party never applied the exclusive FEP definition for Lyme of BCBSA.

94.     In its denial letters to FEP participating patients who were Plaintiff's patients, instead of referring the patients to BCBSNC's secret use of the BCBSA policy regarding the restrictions on the use of long term antibiotics, BCBSNC misrepresented to Plaintiff's patients that Plaintiff's treatment of Lyme with long term antibiotics did not meet the general "medical

27

necessity" standard which was officially used by BCBSNC to determine claims regarding this treatment modality.

95.     In addition the denial letters misrepresented that Plaintiff's treatment of Lyme was "extremely experimental" and "were not considered to be consistent with the standards of good medical practice in the United States" and that they "made little sense".

96.     In 2005 BCBSNC admittedly became alarmed at the costs associated with the long term antibiotic treatment offered by the Plaintiff to Lyme disease patients. It circulated an internal memorandum which targeted the Plaintiff as one of the "Top 25" providers in Charlotte North Carolina whom BCBSNC paid by volume claims. According to BCBSNC's own account the Plaintiff was hurting BCBSNC's financial interest.

97.     BCBSNC's internal report detailed the "volume" of revenue generated by the Plaintiff and JCNC in comparison to the other 25 "Top Providers" in the area.

98.     The report focused the inquiry on the revenue losses caused to BCBSNC by Plaintiff's treatment of Lyme because of the claims submitted for reimbursement. Those claims could not have been officially rejected without taking aim at Plaintiff's business practices in general.

99.     As a result of the internal memorandum circulated by BCBSNC, in 2005 the insurer abruptly stopped paying the patient claims regarding the treatment of Lyme disease as submitted by the Plaintiff and JCNC. Without any warning the insurer took the position against the Plaintiff that oral or IV antibiotics should not be administered for more than 28 days in the treatment of persistent Lyme disease and that past and future claims which did not conform to such treatment would not be reimbursed.

100.    BCBSNC further took the position that all claims which did not comply with that impromptu announced policy would be denied. None of the insurance plans in which the Plaintiff and JCNC were participants provided for any such restrictions at any time.

101.    None of the plans were amended by BCBSNC to reflect any such change in policy. The Plaintiff and his staff were told by BCBSNC staff that no policies and restrictions on the use of long term antibiotics existed until the insurer took the foregoing action to protect its own financial interest in 2005, per its own admissions.

102.    For all of the foregoing reasons, BCBSNC had a vested interest to put the Plaintiff out of business so as to buttress its bottom line financial benefit.

103.    In so doing, the insurer enlisted the help of the defendants to fix the pricing of medical services provided to Lyme disease patients, to form a monopoly of those physicians who provided medical services restricted to those which BCBSNC agreed to reimbursement, to market allocate Lyme disease patients to other physicians in North Carolina who provided less expensive services compatible with BCBSNC's financial interests.

104.    The defendant Rhyne was one of those physicians who actively and directly engaged in the unfair trade restrictions and illegal market allocation practices prohibited by 15 USC Sec. 1 et.seq.

105.    As it turns out, unbeknownst to the Plaintiff until Rhyne's affidavit came to light in June 9, 2014, Rhyne was BCBSNC's direct compensated insider state official on the North Carolina Medical Board. Rhyne was the perfect candidate for the furtherance of BCBSNC's interests on the Board as she was the only infectious disease specialist Janelle Rhyne, M.D.

106.    In addition, the foregoing facts regarding BCBS's business and trade interests did not become known to the Plaintiff until 2014 when the same were uncovered during discovery

29

proceedings in an unrelated case and recited by BCBSNC in court papers in unrelated litigation between the Plaintiff and BCBSNC.

**(iii) Facts relating to the conspiracy and actions of the past and present Board members to violate 15 USC sec. 1 et.seq. from 2006 to the present time.**

107.    Upon information and belief, in 2005,   at the same time when BCBSNC announced that it will no longer pay the Plaintiff for Lyme related medical services which exceeded the duration of 28 days, Rhyne involved the past members of the Board in a conspiracy to spin off and stage complaints of BCBSNC participating patients, spin off staged investigations and precipitate a staged license disciplinary proceeding aimed at restricting Plaintiff's services regarding Lyme disease to those limited by BCBSNC's actions set forth above.

108.    Until 2005 the Plaintiff was never investigated by the Board and is member in connection with any issue.

109.    In a time overlap which was orchestrated to parallel the timing of BCBSNC's drive to close Plaintiff's businesses and to stop payments for his medical services, out of the blue in 2005, upon information and belief, the Board and its past members spun off and solicited and generated complaints and called the Plaintiff in front of a Board committee to answer questions regarding the allegations of the staged and generated complaints.

110.    Initially, in 2005 the conspiracy to violate 15 USC Sec. 1 et.seq.was aimed at restricting Plaintiff's license to stop competing with other members of the Board and with those providing medical services regarding Lyme disease diagnosis and treatment pursuant to IDSA guidelines.

111.    Subsequently in 2007 and 2008, the conspiracy between and among the past members of the Board extended to outright coercing the Plaintiff to abandon his practice of

30

medicine and trade in North Carolina and place his medical license on inactive status and leave the state. Presently the conspiracy was continued and extended and will be extended in the future by the action of the present Board members who continue to enforce the illegal restraints of trade imposed by the 2006 Order and the 2008 "letter of concern". The facts regarding both conspiracies are alleged below.

112.    In an affidavit dated June 9, 2014,   Rhyne admitted that she had a long standing ongoing business relationship with BCBSNC since 1998 through at least the date of the affidavit. That relationship and the business interests which the state official had in BCBSNC, was never disclosed to the plaintiff by any one of the defendants at any time.

113.    From 2005 when the staged Board investigations were initiated against the Plaintiff through June 9, 2014 the business relationship between Rhyne and BCBSNC was in fact purposely concealed by Rhyne and the remaining Board members from the Plaintiff in violation of the North Carolina State Government Ethics Act as set forth below in this complaint.

114.    Similarly, the past and present defendants' receipt of BCBSNC medical payments was never disclosed by any of the defendants to the Plaintiff at any time. Neither was disclosed to the Plaintiff defendants' interest in forming a monopoly to restrict Lyme related medical services in North Carolina only to those accepted for reimbursement by BCBSNC and rendered by the defendants themselves.

115.    According to her own account, at all of the relevant times hereinabove and hereinafter mentioned, Rhyne acted as a consultant in various capacities for BCBSNC since 1989. She wrote and consulted on the writing of BCBSNC's internal Lyme policy aimed at denying claims for the treatment of Lyme patients with long term antibiotics. Rhyne was and is paid by BCBSNC for her services rendered directly to BCBSNC.

31

116. Upon information and belief, Rhyne's role with BCBSNC was specifically described as a Specialty Matched Consultant Advisory Panel. She specifically advised BCBSNC on its medical policies. Rhyne's consulting duties also involved advising BCBSNC on how to handle appeals by participating individuals who were denied benefits for services from BCBSNC providers, including claims related to the treatment of Lyme disease.

117. Upon information and belief Rhyne was and is also a BCBSNC provider in her medical practice compensated for her services by BCBSNC during her tenure with the North Carolina Board. During part of the same time when she was a consultant for hire for BCBSNC, Rhyne was also a public official, a market participant and a voting member of the Board. According to Rhyne's own account she served as a state official on that Board in various capacities between 2003 and 2009. Her services as a medical advisor to BCBSNC extended from 1989 until at least the date of her affidavit of June 9, 2014.

118. The timing of Rhyne's exercise of dual functions as Board member and Board insider for BCBSNC as well as the timing of her involvement of the past members of the Board in the conspiracy to violate 15 USC Sec. 1 et.seq. is important in understanding the antitrust violations perpetrated by the defendants upon the Plaintiff as alleged in this complaint.

119. According to Rhyne's own account she was the head of the Investigative Committee of the North Carolina Medical Board between 2003 and 2006. See Exhibit "A" annexed hereto. Significantly, that committee investigates complaints against medical licensees and recommends to the entire Board whether a physician should be prosecuted within the disciplinary process.

120. Upon information and belief, in conspiracy with past members of the Board's investigative committee and at the behest of BCBSNC and of the group of physicians who provide

32

Lyme related medical services pursuant to IDSA guidelines, Rhyne and other past members of the Board conspired with each other and with BCBSNC to initiate in 2005 investigations regarding Plaintiff's treatment and diagnosis of Lyme disease.

121. In 2005, at approximately the same time when BCBSNC adopted its blanket denial policy against claims and benefits regarding Plaintiff's treatment of Lyme, several complaints to the North Carolina Medical Board were generated by Plaintiff's patients who were participants in BCBSNC plans. Upon information and belief, the past Board members solicited the same complaints. All of the purported complaints were sent to the Board approximately during the same time period in 2005.

122. Most of the complaints took aim at Plaintiff's treatment of Lyme disease with long term antibiotics.

123. Prior to 2005 the Plaintiff never any complaints filed against him with the state medical Board, let alone a cluster of complaints file at the same time by patients who were members in the BCBSNC plans.

124. Upon information and belief the purported patient complaints were staged, generated and solicited by the members of the Board with the aid of BCBSNC in furtherance of the conspiracy to violate 15 USC Sec. 1 et. seq.

125. In the absence of the creation of the appearance of genuine patient complaints the investigative process and in turn the state disciplinary process aimed at restricting Plaintiff's practice of medicine could not have been initiated.

126. The patient complaints which upon information and belief were staged to be filed around the same time period, appear to be a concerted timed effort between BCBSNC, its patients, Rhyne and the past members of the Board to formally enlist and involve the North Carolina

33

Medical Board in what now clearly became known to the Plaintiff to be a conspiracy to restrict Plaintiff's practice of medicine in North Carolina for the financial benefit of the defendants of BCBSNC and of the group of physicians who provide Lyme related medical services pursuant to IDSDA guidelines.

127.    The Plaintiff alleges upon information and belief that Rhyne and the co-conspirators past Board members spearheaded in 2005 the investigation and the disciplinary process aimed at unreasonably restricting Plaintiff's medical services regarding Lyme disease for the purposes of violating 15 USC Sec. 1 et. seq.

128.    After receipt of the staged complaint and during the course of the year 2005, the past Board members of the investigations committee, staged an investigation against the Plaintiff for his diagnosis of Lyme and treatment of the same with long term antibiotics.

129.    The timing of the commencement of state action overlapped and was in concert with the exact timing when BCBSNC's commencement of the denial of Plaintiff's patients' claims related to the treatment of Lyme disease.

130.    At all of the times relevant to this complaint, upon information and belief Rhyne was the only infectious disease specialist during her tenure with the Board's investigative committee

131.    The complaint issues investigated in 2005 by the Board and its members related to Plaintiff's practice of medicine with respect to Lyme disease. Lyme disease is an infectious disease. Because Rhyne was only infectious disease specialist on the Board, upon information and belief, Rhyne's influence, advice and direction given to the past members of the Board as well as her ability to involve the past members of the Board in a conspiracy to violate 15 USC Sec.1et.seq weighed heavily in the facilitation of the conspiracy to violate the foregoing statutory scheme.

34

132.    Upon information and belief, the investigation process which commenced in 2005 was conducted with Rhyne's active involvement and with the involvement of the past members of the Board and the investigative committee.

133.    Rather than abstaining from participating in the state investigation and subsequent state action, Rhyne acted in conspiracy with past members of the Board to illegally commandeer the investigative and disciplinary process in order to precipitate the restraint of Plaintiff's trade practices related to Lyme disease patients for defendants' benefit and for that of BCBSNC

134.    The particular issues purported to be investigated by the Board's investigative committee in 2005 were aimed at the diagnosis and treatment of Lyme disease by the Plaintiff. Those issues were identically the same as the ones based upon which BCBSNC denied Plaintiff's patients' claims as alleged hereinabove.

135.    At no time during the investigative process or during the period of time between 2005 and June 9, 2014, did Rhyne or any other one of the defendants who were then members of the Board ever disclose to the Plaintiff that Rhyne had a long standing financial and business relationship with BCBSNC.

136.    At no time during the investigative process of 2005 or during the period of time between 2005 and the present did any of the past or present Board defendants disclose to the plaintiff that they had a vested financial interest in restricting the type of medical services rendered by the Plaintiff to Lyme patients because the same conflicted with defendants' business interests and with their market participation as alleged in this complaint.

137.    Upon information and belief in furtherance of their conspiracy to violate 15 USC Sec. 1 et.seq., Rhyne in conspiracy with the other members of the investigative committee of the Board recommended in 2005 that the Plaintiff be prosecuted by the Board for the use of long term

35

antibiotics to treat Lyme disease and for the diagnosis of Lyme by clinical methods. Those were the specific issues based upon which BCBSNC decided to withhold payment of benefits to the Plaintiff before the staging of the disciplinary investigations and prosecutions.

138.    Plaintiff's prosecution by the defendants furthered their broad conspiracy to violate 14 USC Sec. 1 et.seq. by seeking to restrict Plaintiff's practice of medicine in North Carolina and specifically the use of long term antibiotic treatment provided to chronically ill Lyme disease patients by the Plaintiff and by physicians who provided similar medical services.

139.    On December 2005, at the recommendation of the disciplinary/investigative committee and of the past Board members, the past members of the Board formally charged Dr. Jemsek with professional misconduct for providing medical services which rivaled with defendants' business interests and market participation with defendant's remuneration for medical services by BCBSNC.

140.    The charges included allegations of improper diagnoses of Lyme disease by clinical means and by ILADS guidelines explained above. The charges also included allegations of improper use of long term antibiotics in the treatment of Lyme disease. These were the same identical issues which were used by BCBSNC as the basis for the denial of the claims of Plaintiff's patients.

141.    Immediately after the Board charges were made public, BCBSNC invoked the formal charges as a pretext to place a total computer hold on all of the claims submitted by the Plaintiff and JCNC. It ordered a review of all pending claims backdating to October, 2005 and it announced that it will not issue payments for the same claims.

142.    After putting a hold on the claims submitted by the Plaintiff and his medical outfit and immediately after the formal charges of the Board were filed against the Plaintiff, BCBSNC

36

scrambled to adopt a formal policy regarding Lyme disease so as to justify the formal denial of Plaintiff's claims.

143.    BCBSNC Lyme policy was noticed on March 2, 2006 and became effective May 8, 2006. Upon information and belief Rhyne further conspired to restrict Plaintiff's trade and to affix pricing of medical services by consulting and helping BCBSNC with the formulation and writing of that restrictive policy at various times.

144.    The action of the past members of the Board which facilitated and precipitated the BCBSNC claim exclusion policy was further aimed at redistributing Plaintiff's patients to other North Carolina physicians who provided Lyme disease related services in accordance the Board's charges of the Plaintiff which was in fact an ex post facto "policy" regarding Lyme.

145.    The official new Lyme treatment policy of the insurer of March 2, 2006 as enforced by the Board and Board members excluded treatments with antibiotics which were longer than 28 days as "medically unnecessary". As a result of the foregoing actions taken by BCBSNC in conspiracy with the Board's actions taken against the Plaintiff and as a result of Board defendants' participation in the same, the insurer buttressed its financial bottom line by avoiding to pay claims to the Plaintiff in excess of $6,000,000.00.

146.    In turn, upon information and belief, the insurer rewarded Rhyne through private payments for her services under the guise of payments made for "consulting".

147.    While conspiring with BCBSNC and with each other, Rhyne and the past members of the Board used their state official capacity as Board members and as members of the Board's investigative committee to commence the process of violating 15 USC Sec. 1 et. seq. through the recommendation for the revocation and/or restriction of Plaintiff's trade regarding the pricing and scope of Lyme disease related medical services.

148.    To facilitate and seal Plaintiff's fate Rhyne and the past members of the Board including members of the investigative committee, made sure that they also participated in the formal disciplinary hearing and in the entire disciplinary adjudicative process which they convoked against the Plaintiff. That process culminated with the issuance of the 2006 disciplinary order (Exhibit "B" hereto).

149.    The formal hearings of the Board against the Plaintiff were conducted on June 14, 2006, continued on June 15, 2006 and were concluded on July 20, 2006. Rhyne and the past members of the investigative committee were active participants in the disciplinary hearings and the process which culminated with the issuance of the 2006 Order (Exhibit "B" hereto). That Order restricted Plaintiff's treatment and diagnoses of Lyme by methods other than the ones prescribed in the BCBSNC policy written by Rhyne herself and by methods and medical services other than the ones provided by IDSA guidelines.

150.    All of the foregoing involvement of the past Board members and of Rhyne in the formal disciplinary process took place while Rhyne and the past members of the Board concealed their business interests and ignored the fact that they were market participants.

151.    The past members did not disclose that they had a vested business interest in restricting Plaintiff's services relayed to the diagnosis and treatment of Lyme disease for the purpose of creating a monopoly in violation of 15 USC Sec. 1 et.seq.    The record is simply silent and devoid of any such disclosure for anyone.

152.    After the conclusion of the hearings Rhyne and all of the past Board members participated in and directly influenced the deliberation process conducted by the members of the past Board members regarding the outcome of the hearings. The process also determined the

38

nature and extent of discipline to be imposed upon the Plaintiff and the restrictions imposed on Plaintiff's trade as evidenced by the 2006 Order Exhibit "A" hereto.

153.    On August 21, 2006 at the conclusion of the foregoing staged disciplinary process, the Board and the past members of the Board issued a disciplinary order against the plaintiff. See Exhibit "A" annexed hereto.

154.    The 2006 Order attained the goal of the conspiracy to violate 15 USC Sec. 1 et. seq. by restricting Plaintiff's practice of medicine in North Carolina related to medical services aimed at the treatment of Lyme disease.

155.    The Order further imposed a condition that Plaintiff could not treat Lyme disease with long term regiments of antibiotics. It stamped out any type of medical services which were not in line with BCBSNC's policies or with Rhyne's and past Board members' financial interests. See exhibit "A" hereto.

156.    The 2006 Order which is the byproduct of the foregoing conspiracy to violate 15 USC Sec 1. et. seq. remains in full force and effect today and it is enforced, will continue to be enforced and will be kept of record by the present members of the Board in furtherance of the conspiracy entered into with the past members of the Board and BCBSNC to violate 15 USC Sec. 1 et.seq.

157.    Upon information and belief, the present members of the Board conspired and continue to conspire with each other and with the past members of the Board to keep in full force and effect the continued unreasonable restrictions placed on Plaintiff's treatment of Lyme by the 2006 Order in violation of 15 USC Sec. 1.

158.    Upon information and belief the present physician members of the Board provide or have the ability to provide Lyme related medical services which conform within the restrictive

39

policies and confines imposed by BCBSNC and those imposed by the past members of the Board in the 2006 Order. Upon information and belief the present physician members of the Board are market participants.

159.   The present members of the Board continue to enforce the 2006 Order in conspiracy with the past members of the Board and in a continuous conspiracy with each other to violate 15 USC Sec 1 et.seq.

160.   Defendants' conspiracy to violate 15 USC Sec. 1 et.seq. did not stop with the restrictions imposed by the 2006 Order.

161.    Rhyne further admitted in her sworn affidavit of June 8, 2014 that after the completion of the disciplinary action against the Plaintiff in 2006, she acquired actual knowledge from BCBSNC during a telephone conference which she had with a medical director of the insurer, that BCBSNC "had a hard time with a Lyme Disease doctor, Dr. Jemsek".

164.   Under North Carolina law as it stood at the time Rhyne had an affirmative duty to both investigate and disclose to the Plaintiff and to discuss with the members of the Board both the extent of BCBSNC's "problems" with Dr. Jemsek and her personal business relationship with BCBSNC. In turn al of the past and present Board members had a duty to investigate and disclose to the Plaintiff their own financial interests as well as their own market participation.

165.   Upon information and belief, Rhyne and the remaining past members of the Board did act in concert to restrict Plaintiff's trade in 2006 as set forth above in this complaint, for their own financial and trade benefit, for the benefit of BCBSNC and for the financial and trade benefit of physicians who provide Lyme related medical services in accordance with IDSA guidelines. Once facts became known to members of the Board which put them on collective inquiry notice (Rhyne's telephone conversation alleged above with the BCBSNC representative), rather than

40

reversing course and investigating their own past actions, the past members of the Board did nothing. Nor did the present members of the Board do anything to investigate the actions of the past members of the Board and the validity of the 2006 Order and the 2008 letter of concern which impose trade restrictions upon the Plaintiff in violation of 15 USC Sec. 1 et.seq.

166.    At the present time, the present Board member defendants have actual knowledge of all of the allegations pleaded in this complaint and of the conduct of the past Board members as specified herein. Yet the present Board members continue to maintain of record and to enforce the 2006 Order and the unreasonable restrictions of trade which it imposes on the Plaintiff in violation of 15 USC Sec. 1 et.seq. while conspiring with the past members of the Board to continue to violate the foregoing statute.

**(iii)    Facts relating to the conspiracy and actions of the past and
present Board members to violate 15 USC Sec. 1 et.seq. from
<u>2007 to the present time of this complaint.</u>**

167.    After the restraints of trade placed on plaintiff's practice of medicine and upon his Lyme related medical services, by the Board Order of 2006, the Plaintiff continued to practice medicine in North Carolina under the restrictions imposed by the defendants.

168.    That was neither to defendants' liking nor to that of the insurer BCBSNC not to the liking of the group of physicians who provide Lyme related medical services pursuant to IDSA guidelines.

167.    Consequently, in 2007 the defendants past members of the Board again conspired with each other to once again use the North Carolina license disciplinary system for the purposes of violating 15 USC Sec. 1 et.seq. and furthering their own financial and trade interests as market participants. The defendants were bent on ending Plaintiff's competition for good.

168.    The Disciplinary Committee is made up of six Board Members that review and

41

make recommendations to the full Board in cases after Board staff recommends either public or private action. At the same time when she was working with BCBSNC to stamp out Lyme related medical services which did not fit the IDSA guidelines and the BCBSNC policies, by her own account, during 2006 and 2008, Rhyne served on the Disciplinary Committee of the North Carolina Medical Board, in her capacity as member and as chair of the Committee.

169.     According to the Board's own description, the disciplinary committee reviews all investigations, complaints, medical malpractice payment reports and Medical Examiner cases in which the Senior Staff Review Committee (SSRC) recommends some form of public or private action, an informal interview, or an order for examination. Committee members usually discuss only those cases which, prior to the meeting, members have extracted for discussion.

170.     During the time of the 2007 staged investigation, BCBSNC's insider Janelle Rhyne was the Chair for the disciplinary Committee of the Board. By Board's own definition of that position, she actively participated in the initiation and supervision of the Board investigation of 2008 as set forth above.

171.     Upon information and belief Rhyne's participation and oversight of the investigation and her enlistment of the past Board members in the conspiracy to run the Plaintiff out of North Carolina in order to stamp out his competitive services rendered to Lyme patients was initiated in furtherance of Rhyne's and the past Board defendants' conspiracy to violate 15 USC Sec. 1 et. seq.

172.     During June of 2007 the past members of the Board and the Disciplinary Committee of the Board, under Rhyne's leadership and tutelage, spun a new investigation against the Plaintiff for his purported use of hyperbaric chambers to treat Lyme disease patients.

42

173.    Plaintiff used hyperbaric chambers to lessen the pain of rheumatism and other Lyme disease symptoms in patients who had the same. The medical services regarding the use of hyperbaric chambers in connection with the treatment of Lyme disease symptoms were not restricted by the 2006 Order.

174.    At the same time, the past Board defendants used their official capacity to send investigators from the Board to meet with the Plaintiff. The Plaintiff hired an attorney to represent him in connection with the newly staged investigations. Through their counsel, the Board and the member defendants relayed in 2007 to the Plaintiff that if he allowed his North Carolina medical license lapse or to become inactive, the investigation and further discipline against Jemsek will not be pursued by past members of the Board.

175.    The defendants' wrongful conduct as set forth hereinabove, involved the relaying of messages to the Plaintiff that he should abandon his active medical license and the practice of medicine and leave North Carolina so as to avoid additional discipline including license revocation. Such conduct amounts to coercion in furtherance of the conspiracy to violate 15 USC Sec. 1 et.seq.

176.    In the first place, the Plaintiff suffered tremendous financial losses between 2006 and 2008 as a result of defendants' illegal activities conducted in violation of 15 USC Sec. 1 et.seq. as alleged hereinabove. Upon information and belief the past Board members knew of Plaintiff's financial losses caused by the restriction imposed by the 2006 Order as Plaintiff's BCBSNC claims were not being paid based upon the same Order.

177.    Consequently, after the Board and its members relayed the foregoing message to Dr. Jemsek directing him to abandon his license and practice of medicine in North Carolina, but prior to any additional disciplinary action being taken against him, under pressure from the Board

43

officials as set forth hereinabove in 2007, the Plaintiff had no choice but to close his practice in North Carolina so as to avoid further disciplinary prosecution for his treatment of Lyme disease. It is at that time that the Plaintiff placed his North Carolina license on inactive status under duress, and left that state. The defendants offered the Plaintiff no choice but to avoid the pre-ordained consequence of having his medical license revoked by the past Board defendants who acted in violation of 15 USC Sec. 1 et.seq.

178.    The Plaintiff declared bankruptcy as a result of defendants' actions and he moved his practice to South Carolina.

179.    As if the foregoing actions of the past Board defendants were insufficient and not to their satisfaction, on June 23, 2008, after making use of official Board action to run Jemsek out of North Carolina through the threats of additional disciplinary action, the past Board defendants led by Rhyne, who was then the President of the Medical Board, authored a "Public Letter of Concern" regarding Dr. Jemsek. See Exhibit "B" annexed hereto.

180.    Said letter's sole purpose was to further demean Plaintiff and attack his medical practices in order to stamp out Plaintiff's trade competition and to ensure that the Plaintiff never returned to North Carolina to practice medicine again.

181.    The intended effect of both the 2006 Order and of the 2008 letter was not only to restrict Plaintiff's trade competition offered to North Carolina citizens, but to restrict his practice of medicine nationwide by providing services to Lyme disease patients by protocols and medical approaches which threatened and competed with defendants' medical practices and business interests.

182.    Upon information and belief, the defendants were hopeful and intended that in issuing the letter of concern of 2008 and the 2006 Order of discipline, because of the reciprocal

44

discipline statutes which are in effect in every state, no medical Board would license the Plaintiff anywhere in the country to practice medicine in the competitive manner which threatened defendants' own business interest.

183. The understanding of the relevant time line pertaining to Rhyne's and past board defendant's involvement with BCBSNC's Lyme policies which preceded the issuance of the letter of concern of June 23, 2008 is of importance to illuminating the background of the conspiracy to violate 15 USC Sec. 1 et.seq.

184. On March 31, 2008, Rhyne admittedly reviewed BCBSNC's medical policy on diagnosis and treatment of Lyme disease.

185. Rhyne validated the restrictions of the same policy based upon the 2006 Order restrictions. She further validated the same restrictions based upon which BCBSNC rejected Plaintiff's claims in 2006.

186. Upon information and belief, Rhyne and the past Board defendants had further input in the BCBSNC Lyme policy and approved the terminology which restricted the practice of medicine in the field of Lyme disease in North Carolina with restrictions similar to the ones imposed by the Board order of August 21, 2006. (Exhibit "B" hereto).

187. Because of Rhyne's and past Board defendants' conspiracy to violate 15 USC Sec. 1 et.seq. in the manner specified hereinabove, in 2008, the BCBSNC Lyme disease policy officially had behind it the muscle and authority of the North Carolina Medical Board and it continues and will continue to have that validation through this date and in the future because of the continuous conspiracy acts perpetrated by the present members of the Board to violate 15 USC Sec. 1 et.seq. by keeping in full force and effect the 2006 Order and the 2008 letter of concern.

45

188.     About three months after March 31, 2008 when Rhyne reviewed the BCBSNC restrictive policy on medical treatments for Lyme for BCBSNC, and approved the same, the letter of concern against Jemsek was issued by the past members of the Board and signed by Rhyne herself on June 23, 2008. Exhibit "B" hereto.

189.     Significantly, attesting to the conspiracy to violate 15 USC Sec. 1 et.seq. is the fact that the past members of the Board, the present members of the Board and Rhyne concealed from the Plaintiff the facts surrounding the conspiracy to violate 15 USC Sec. 1 et.seq. until June 9, 2014 when the same inadvertently came to light because of Rhyne's affidavit.

190.     During the Board meeting of July 16-18, 2008 Rhyne participated in and influenced the discussions of all of the Board's executed cases through 2008. She enlisted the help and conspired with the past Board members to have approved the 2008 letter of concern issued to the Plaintiff after the said members effectively coerced the Plaintiff to close down his North Carolina practice and place his medical license on inactive status.

191.     According to Rhyne's own account, she continued and continues to provide services for hire to BCBSNC throughout the time of the affidavit in 2014.

192.     At none of the relevant times hereinabove and hereinafter mentioned did any of the past or present Board members disclose to the Plaintiff that they had a personal interest of putting the Plaintiff out of business for the purposes of imposing a monopoly, affixing prices for medical services and restricting Plaintiff's trade while furthering their own trade and business interests, those of the insurer BCBSNC and those of the groups of physicians who offer Lyme related medical services within the restrictions if IDSA guidelines only.

46

**(vi)** **Rhyne and the members of the Board had an affirmative
duty to disclose their own business and financial interests and
conflicts to the Plaintiff and to abstain from acting and continue
to act against the Plaintiff in furtherance of their conspiracy to
violate 15 USC Sec. 1 et.seq.**

193.    On January 12, 2001 the then governor Michael Easely issued Executive Order No.

1. The Executive Order required public officials to disclose conflicts of interest and mandated that

no public official shall use his or her position in any manner which will result in financial benefit

direct or indirect to the public official "or a business organization or group with which the public

official is associated".

194.    The Executive Order also required Public Officials to disclose any business entity

with which the Public Official has a financial or professional relationship provided that a

reasonable person would conclude that the nature of the financial or professional relationship

presents a conflict of interest or the appearance of a conflict of interest for the Public official.

195.    Rhyne and the past Board members were subject to the disclosure mandates of

Executive Order No. 1 regarding their professional and business relationship with BCBSNC and

their personal business interests.

196.    During the Medical Board meeting of July 16-18, 2008, when the 2008 letter of

concern was approved, Rhyne, as the medical board president, opened the medical Board

proceedings by reading into the record the conflict of interest provisions of Executive Order 1

regarding conflicts of interest disclosure. The minutes reflect that "no conflicts reported". This

lack of disclosure and outright fraudulent concealment by Rhyne and past Board members of their

conflicts created by their own business interests and by their affiliation with BCBSNC as set forth

above, is further testimony to the conspiracy to violate 15 USC Sec. 1 et.seq.

47

197.    Upon information and belief, the physician past members of the Board respectively had direct business relationships with BCBSNC because they received claim reimbursements and payments for their medical services from the same insurer. They were and currently also market participants as they practiced and continue to practice medicine in North Carolina and they are licensed by the Board.

198.    Neither Rhyne nor the past Board members disclosed their own personal financial interests and their affiliations with BCBSNC as they pertained to their interactions with and official state action taken against the Plaintiff.

199.    Upon information and belief, the past physician members of the Board also had a vested interest in conspiring with each other to violate 15 USC Sec. 1 et.seq. with respect to the Plaintiff and to conceal their own business interests and their affiliation with BCBSNC. That interest furthered the purposes of availing the past Board members of an opportunity of the vertical and horizontal redistribution of Plaintiff's patients to their own practices and for the further purposes of buttressing the financial bottom line of the insurer who paid for their medical services rendered to patients under BCBSNC plans.

200.    In addition, in order to ensure that the state officials such as the past and present Board members do not use their position for financial gain and inter alia for the perpetration of violations of 15 USC Sec. 1 et.seq., the North Carolina legislature enacted in 2008 the State Government Ethics Act. The provisions of the Act are codified in NC Gen Stat Secs. 138A-1 through Sec. 138A-45.

201.    The purpose of the Act as stated in N.C. Gen Stat as Sec. 138A-2 is specifically to prevent conduct of the state officials such as the one specified in this complaint. The purpose of

48

the statute is to ensure that elected and appointed State agency officials exercise their authority honestly and fairly, free from impropriety, threats, favoritism, and undue influence.

202.    NC Gen. Stat Sec. 138A-21 and Sec. 138A-35 specifically impose a mandatory statutory duty upon public officials to disclose their financial interests, to identify potential conflicts    of interest between the public official's public duties and private interests.

203.    The statutory scheme mandates that the public officials, in this case Rhyne and all of the present and past Board members who adjudicated and investigated the Jemsek matters in 2006 and 2008 as well as the present members who have any affiliation with BCBSNC and who provide or have the ability to provide Lyme related medical services,    do the following: (a) make a due and diligent effort before taking any action, including voting or participating in discussions with other public servants on a board on which the public servant also serves, to determine whether the public servant has a conflict of interest; (b)    continually monitor, evaluate, and manage the public servant's personal, financial, and professional affairs to ensure the absence of conflicts of interest.

204.    The public officials are given no deference and no discretion in discharging the foregoing statutory obligations. Where a conflict of interest such as the ones present here exist, they have to be disclosed and the member of the Board who has such conflict cannot participate in any governmental action proceedings including investigations and prosecutions or the continued enforcement of past Board actions such as the 2006 Order and the 2008 Letter of Concern.

205.    Rhyne and the past and present Board members knew and should have known at the time of the investigation and adjudication of the 2006 and 2008 matters that Rhyne's affiliation with BCBSNC and her participation in the disciplinary actions against the Plaintiff alongside the

49

other members of the Board created a conflict of interest for everyone. The defendants should have known that their participation along-side Rhyne in the staged disciplinary state actions aimed at restricting Plaintiff's trade and practice of medicine in North Carolina and nationally, turned them into co-conspirators for the purposes of furthering the conspiracy of violating 15 USC Sec. 1 et.seq. as alleged hereinabove.

206. The past and present physician Board members knew and should have known upon diligent inquiry that Rhyne and BCBSNC's agenda was to restrict Plaintiff's practice of medicine and to run him out of state though the use of the North Carolina medical license disciplinary process as he was a business competitor.

207. The past and present physician members of the Board conspired with each other to restrict Plaintiff's trade by failing to disclose their own affiliation with BCBSNC and by conspiring to price affix the pricing of medical services rendered to patients in North Carolina exclusively to those prices approved under Rhyne's and BCBSNC's policies on Lyme as alleged hereinabove.

208. All of the Board physicians are market participants as they stood and still stand to make financially gains and gain an unfair trade advantage by ousting the Plaintiff from the unrestricted practice of medicine in North Carolina and by absorbing Plaintiff's patients intro their own medical practices.

209. N.C. Gen Stat Sec. 138A-22 mandates that all of the other past and present Board defendants file with the State Ethics Commission a disclosure of their financial interest prior to the commencement of service on the North Carolina Board and then on April 15 of each year thereafter for so long as Rhyne served as a Board member.

210.    Upon information and belief none of the physician defendants filed any statement of financial interest with the State Ethics Commission disclosing their respective compensation and employment by BCBSNC prior to their appointment to the Board or subsequently thereafter.

211.    The failure to disclose the financial affiliations with BCBSNC amounted to a further step in the conspiracy to restrict Plaintiff's trade while disguising violations of 15 USC Sec 1 et. seq. as purported bona fide disciplinary proceedings brought against the Plaintiff.

**(vii)    The present Board defendants continue to conspire with
each other and with the past Board defendants and
to violate 15 USC Secs. 1 et. seq.**

212.    The present Board member defendants continue to conspire with each other and with the past members of the Board and with BCBSNC to maintain and continue to maintain in full force and effect and of record the 2006 Order and 2008 letter of concern which impose restrictions on Plaintiff's trade and create a monopoly for the benefit of the said defendants as alleged in this complaint.

213.    The present members of the Board conspired and continue to conspire with each other and with the past members of the Board to keep the Plaintiff and his competitive medical services out of North Carolina for their own financial gain and for that of BCBSNC by refusing to remove off record the 2006 Order and the 2008 letter of concern and by further refusing to reinstate Plaintiff's medical license to active unrestricted status.

214.    The present members of the Board are aware of facts regarding the existence of the conspiracy between Rhyne, BCBSNC and the past members of the Board to violate 15 USC Sec.

51

1 et. seq. and to unreasonably restrict Plaintiff's practice of medicine in North Carolina for their own benefit, and for the purposes of creating a monopoly of medical services.

215.    The present physician Board members are market participants because they practice medicine in the state of North Carolina and they are Board licensees. They compete for the same patient pool from which the Plaintiff derived his own while practicing unrestricted medicine in North Carolina.

216.    Upon information and belief the present physician Board members are compensated for their medical services by BCBSNC.

217.    Upon information and belief the present members of the Board provide or in the alternative have the ability to provide presently and in the future, Lyme related medical services which conform to the monopoly and price fixing practices set by the Board and by BCBSNC through the 2006 Order and though the insurer's own private policies incorporated in the 2006 Order.

218.    The present Board members have a vested interest in keeping the Plaintiff's practice out of North Carolina because they can rid of his competition by simply continuing to conspire to enforce and continue in full force and effect the restrictions which the prior of the members of the Board generated through the issuance of the 2006 Order and the 2008 letter of concern.

219.    The present members of the Board also conspired and continue to conspire with each other and with the past members of the Board to violate 15 USC Sec. by keeping in full force and effect the coerced inactive status of Plaintiff's medical license. Upon information and belief the present members of the Board refused in advance to honor any attempts by the Plaintiff to have the same reinstated to active status.

220.    The present Board members conspired and continue to conspire with each other and with the past Board members to unreasonably restrict Plaintiff's trade and the practice of medicine in North Carolina in violation of 15 USC Sec. 1 et.seq.  so as to further their own business and financial interest by stifling competition, by engaging in price fixing, market allocation and by creating a monopoly of medical services which comport with the guidelines and interests of BCBSNC and of the individual defendants.

**(viii)    <u>Affirmative allegations pertaining to the statute of limitations.</u>**

221.    15 USC Sec. 15b imposes a four years limitations on antitrust actions brought under 15 USCS § 15, 15a, or 15c from its accrual.

222.    The present action is brought under 15 USC Sec. 26 seeking an injunction of defendants' continuous and present conspiracy which violates 15 USC Sec. 1 as set forth hereinabove.

223.    The four year statute of limitations of 15 USC Sec. 15b by its own terms does not apply to actions for injunctive relief brought under 15 USC Sec. 26.

225.    Even if the four year statute of limitations of 15 USC Sec. 15b was to apply here, the Plaintiff affirmatively states that because the defendants concealed from him the facts recited hereinabove and he did not discover the same until June 2014, when some of the same facts became known to the Plaintiff through unrelated discovery and Rhyne's own affidavit of June 9, 2014, the four year statute of limitations was tolled until the concealed facts were discovered by the Plaintiff so as to enable him to bring this action.

**(ix)     Affirmative allegations regarding the request
          for an injunction pursuant to 15 USC Sec. 26.**

226.     The Plaintiff affirmatively alleges that defendants' continued acts in maintaining of record the license restrictions imposed by the continuous and present effectiveness of the 2006 Order and the 2008 letter of concern effectively continue to place the Plaintiff out of business in the State of North Carolina and prevent the Plaintiff from offering competitive medical services to Lyme patients suffering from long term and chronic Lyme disease.

227.     The threat of being placed out of business as well as the effective effect of placing the Plaintiff out of business in North Carolina amounts to irreparable injury in the context of an injunction sought pursuant to 15 USC Sec. 26.

228.     In addition, an award of money damages as opposed to keeping the Plaintiff in the competitive business of providing Lyme related medical services in North Carolina is a public disservice and it does not amount to a remedy in lieu of an injunction.

229.     The Plaintiff also states that the unreasonable trade restrictions which continue to be imposed upon him by the defendants makes it extremely likely that he continues and will continue to lose his market share of customers in North Carolina.

230.     Equitable decree in private antitrust suit should award plaintiff injunctive relief to extent necessary to protect it from future damage likely to occur if defendant continues unlawful antitrust conduct.

231.     The enforcement and continuation of the illegal trade restrictions imposed by the 2006 Order and the 2008 letter of concern as set forth hereinabove are causing the Plaintiff continuous and future damage to his business because he is not allowed to practice medicine in

North Carolina and to provided competitive Lyme related medical services as alleged hereinabove in this complaint.

## AS AND FOR A FIRST CLAIM FOR RELIEF - INJUNCTION PURSUANT TO 15 USC Sec. 26.

232.     Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "231" above with the full force and effect as if the same are set forth herein.

233.     From September 14, 2014 through the date of this complaint, the past and present Board members conspired with each other and continue to conspire to violate 15 USC Sec. 1 et.seq. by perpetuating the actions of the past members of the Board as alleged hereinabove and by doing or causing to be done the following: (a) maintaining of record and in full force and effect the 2006 Order and the 2008 letter of concern as a restriction of Plaintiff's trade; (b) engaging in price fixing by restricting the types of medical services which the Plaintiff and physicians in North Carolina can offer to Lyme patients so that the pricing comports with BCBSNC's price schedules as enforced through the actions of the past members of the Board as alleged in this complaint; (c) engaging in the continuation of a monopoly created by the existence of the 006 Order which prohibits the Plaintiff from providing services other than the ones provided or have the potential of being by the Board   members who are market participants, and in accordance with the restrictions imposed by the 2006 Order; (d) continuing in full force and effect the coerced inactive status of Plaintiff's license and upon information and belief, refusing in advance to remove the same upon Plaintiff's application.

234.   15 USC Sec. 26 vests this Court with subject matter jurisdiction to issue an injunction on an application from a private party for the purposes of enjoining the further violation of any section of the Sherman Antitrust Act, 15 USC Sec. 1et.seq.

235.   Plaintiff is seeking injunctive relief pursuant to 15 USC Sec. 26 enjoining the defendants, past and present members of the Board from conspiring and continuing to conspire with each other to violate 15 USC Sec. 1 et.seq. by restraining Plaintiff's trade and practice of medicine   in North Carolina as set forth above in this complaint and by engaging in price fixing, market allocation and unfair trade practices through the use and under the color of the disciplinary Order of 2006 and the "letter of concern" of 2008 as more particularly set forth above in this complaint.

236.   The Plaintiff is further seeking an affirmative mandatory injunction pursuant to 15 USC Sec. 26 enjoining the present members of the Board from maintaining of record, causing to maintain of record, enforcing or causing to be enforced the Board Order of 2006 and the "letter of concern" of 2008 on the grounds that the same amount to a violation of 15 USC Sec. 1 because: (1) the same documents and state action illegally restrain Plaintiff's trade and practice in North Carolina and specifically the offering and use of competitive medical service to Lyme patients; (2) because the Order of 2006 and "letter of concern" of 2008 form a monopoly protecting the business interests of the defendants and of the non-party insurer BCBSNC who and which rely on the same order to limit the type of medical services offered to Lyme patients in and out of North Carolina. The services are limited to those offered by the defendants and to those services which BCBSNC dictated that payments should be made for; (3) the Order of 2006 and "letter of concern" of 2008 amount to unfair market reallocation of Plaintiff's patients to the defendants to the extent that Lyme disease medical service are restricted to those which are practiced or potentially can be

56

practiced by the defendants and to those restricted by the policy of BCBSNC for the purposes of protecting its own business interests; (4) the Order of 2006 and "letter of concern" of 2008 amount to agreements and trusts by and between the defendants co-conspirators to violate 15 USC Sec. 1 et.seq. in the manner set forth above in this complaint; (5) the Order of 2006 and the letter of concern of 2008 amount to prohibited price fixing under 15 USC Sec. 1 et.seq, because the same affix the pricing of specific Lyme related medical services as sanctioned by BCBSNC schedules and as adopted by the Board defendants within the restrictive types of services defined in the 2006 Order.

237. The Plaintiff has not commenced an antitrust cause of action at any time against any one of the defendants either in state or federal courts prior to the commencement of this action.

238. Defendants' perpetuation into the future of the existence of the 2006 Order and the 2008 letter of concern amount to future and further violations of 15 USC Sec. 1 et.seq. amounts to future violations of the antitrust statues as codified in 15 USC Sec. 1 et. seq.

239. For all of the foregoing reasons the Plaintiff is seeking an antitrust injunction pursuant to 15 USC Sec. 26 in the form and substance set forth hereinabove.

## AS AND FOR A SCOND CAUSE OF ACTION - DECLARATORY JUDGMENT PURSUANT TO 28 USC SEC. 2201.

240. Plaintiff repeats, reiterates and realleges each and every allegation set forth in paragraphs "1" through "239" above with the full force and effect as if the same are set forth herein.

241. The Plaintiff prays for relief in the form of a declaratory judgment under 28 USC Sec. 2201 et.seq. declaring the Board defendants' disciplinary order of August 21, 2006 and the

letter of concern dated June 23, 2008 as well as the perpetuation, continuous enforcement and continuation of the same by the present members of the Board as actions which violate 15 USC Sec. 1 et. seq. for all of the reasons articulated hereinabove in this complaint.

242.    For all of the above referenced reasons the Plaintiff is seeking a declaratory judgment pursuant to 28 USC Sec. 2201 in the form and substance set forth hereinabove.

WHEREFORE, the Plaintiff demands judgment against the defendants as follows aimed at preventing their further engagement in antitrust actions against the Plaintiff as follows: (a) an injunction pursuant to 15 USC Sec. 26 in the form and substance set forth above; (b) a declaratory judgment pursuant to 28 USC Sec. 2201 in the form and substance set forth above.

Respectfully submitted this the 2nd day of February, 2016.

Attorneys for the Plaintiff:

*/s/ Jacques G. Simon*
Jacques G. Simon, Esq.
Out of State Lead Attorney
2174 Hewlett Avenue, Suite #201
Merrick, NY 11545
Phone: (516)378-8400
Fax:    (516)378-2700
Email: jgs@jacquessimon.com
New York Reg. No.: State 2267417
EDNY & SDNY No. : JS 9212


*/s/ Robert A. Meynardie*
Robert Meynardie Esq., NCSB #20566
Meynardie & Nanney, PLLC
2840 Plaza Place, Suite 360
Raleigh, North Carolina 27612
Phone: (919) 747-7373
Fax:    (919) 324-3693
Email: bob@mnlaw-nc.com
Appearing pursuant to Local Civil Rule 83.1

58