IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-59-D

| | | |
|---|---|---|
| JOSEPH JEMSEK, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NORTH CAROLINA MEDICAL BOARD, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

On February 2, 2016, Joseph Jemsek, M.D., ("Jemsek" or "plaintiff") sued the North

Carolina Medical Board ("NCMB"or "the Board") and various current and former Board members

in both their individual and official capacities [D.E. 1]. On March 9, 2016, Jemsek amended his

complaint [D.E. 66]. Jemsek alleges that the Board and its members (collectively, "defendants")

conspired to violated the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and seeks declaratory and

injunctive relief. On April 7, 2016, defendants moved to dismiss Jemsek's amended complaint

under Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6) [D.E. 68] and filed a supporting

memorandum [D.E. 69]. On May 26, 2016, Jemsek responded in opposition [D.E. 74 & 75]. On

June 13, 2016, defendants replied [D.E. 79]. As explained below, the court grants defendants'

motion to dismiss.

I.

A.

This case concerns various disciplinary actions the NCMB took against Joseph Jemsek, M.D.

Jemsek is a physician licensed to practice medicine in North Carolina, but his license is currently

inactive. Am. Compl. [D.E. 66] ¶ 32. He currently practices medicine in Washington, D.C. Id.

In 2000, Jemsek founded the Jemsek Clinic in Charlotte, North Carolina. Id. ¶ 61. He is and was at all relevant times certified by the American Board of Medical Specialties in internal medicine and infectious disease. Id. ¶ 62. In 2001, Jemsek began focusing his practice on treating individuals with persistent and chronic Lyme disease. Id. ¶¶ 65–66. In doing so, Jemsek routinely treated his Lyme-disease patients with long-term antibiotic regimens. Id. ¶ 66. The Infections Disease Society of America ("IDSA") guidelines did not recognize the efficacy of treating Lyme disease with long-term antibiotics beyond 28 days. Id. ¶ 70. Jemsek, however, used the International Lyme and Associated Disease Society's ("ILDAS") guidelines, which placed no durational limit on treating Lyme disease with long-term antibiotics. Id. ¶¶ 71–72.

Beginning in 2001, Blue Cross Blue Shield of North Carolina ("BCBSNC") reimbursed Jemsek's clinic for its use of long-term antibiotics to treat patients with chronic Lyme disease. Id. ¶ 86. Before treating Lyme-disease patients, Jemsek's staff would call BCBSNC to confirm coverage for long-term antibiotic treatment. Id. ¶ 88. "In nearly every case" BCBSNC communicated that its plans imposed no restrictions on the use of intravenous or long-term antibiotics to treat Lyme disease. Id. Rather, BCBSNC relied upon the general paradigm of "medical necessity" to determine on a case-by-case basis which claims to accept or reject. Id. ¶ 87.

In 2003, BCBSNC began examining Jemsek's claims regarding the use of long-term antibiotic therapy for Lyme-disease sufferers. Id. ¶ 90. In doing so, BCBSNC applied a Blue Cross Blue Shield Association policy that defined all courses of antibiotics lasting longer than 28 days to be "medically unnecessary" for treating Lyme disease. Id. ¶¶ 91–92. BCBSNC never informed Jemsek that it used this specific policy to deny Jemsek's patients' claims. Id. ¶¶ 91, 93. Instead, BCBSNC told Jemsek's patients that Jemsek's use of long-term antibiotics did not meet the general "medical necessity" standard. Id. ¶ 94.

In 2005, BCBSNC circulated an internal memo listing Jemsek as one of the top 25 providers in the Charlotte area to which BCBSNC paid the greatest volume in claims. Id. ¶¶ 96–97. Later in 2005, BCBSNC stopped paying Jemsek's patients' claims for long-term antibiotic use in treating Lyme disease. Id. ¶ 99. For the first time, Jemsek learned that BCBSNC would not reimburse claims for antibiotic treatment of Lyme disease beyond 28 days. Id. Jemsek alleges that, in taking these actions, BCBSNC enlisted defendants' help in order to put Jemsek out of business by fixing the pricing of Lyme-disease treatment, forming a monopoly in favor of physicians whom BCBSNC agreed to reimburse, and allocating market share for Lyme-disease patients to physicians providing less-expensive services. Id. ¶¶ 102–03.

Also in 2005, around the same time BCBSNC notified Jemsek of its policy toward long-term antibiotic treatment of Lyme-disease patients, some of Jemsek's patients lodged complaints with the NCMB regarding Jemsek's treatment of their Lyme disease with long-term antibiotics. Id. ¶¶ 121–22. The patients participated in BCBSNC plans. Id. Jemsek alleges that former NCMB members solicited, generated, or staged the complaints. Id. ¶¶ 107, 109, 121. In response to the complaints, the NCMB investigated Jemsek's practice and asked him to answer questions regarding the patients' complaints. Id. ¶¶ 107, 109, 128. Specifically, the investigation concerned itself with Jemsek's use of long-term antibiotics in treating Lyme-disease patients. Id. ¶¶ 128, 131, 134.

In December 2005, the NCMB recommended charging Jemsek with professional misconduct for improperly diagnosing Lyme disease and improperly using long-term antibiotics to treat Lyme disease. Id. ¶¶ 139–40. After the charges against Jemsek were made public, BCBSNC relied on the formal charges to place a hold on all claims of Jemsek and his clinic. Id. ¶ 141. BCBSNC also ordered a review of all pending claims dating to October 2005 and stated that it would not pay such claims. Id. ¶ 141.

3

On March 2, 2006, BCBSNC announced a formal policy regarding Lyme disease, which became effective on May 8, 2006. Id. ¶ 143. The policy excluded antibiotic treatment of Lyme-disease patients for longer than 28 days as "medically unnecessary." Id. ¶ 145. Jemsek alleges that this action was taken in concert with the NCMB's proceedings against Jemsek as part of a conspiracy to financially benefit BCBSNC. Id.

Jemsek's formal hearings before the NCMB began on June 14, 2006, and ended on July 20, 2006. Id. ¶ 149. The process culminated with the NCMB issuing a disciplinary order on August 21, 2006 (the "2006 Order"). Id. ¶¶ 149, 153; Am. Compl. Ex. A. The 2006 Order contained certain findings of fact, including that Jemsek diagnosed Lyme disease in a manner that departed from accepted and prevailing standards of medical practice; administered treatment that similarly diverged from accepted and prevailing practices, specifically his use of long-term antibiotics; failed to adequately educate and inform his patients that his method of diagnosing Lyme disease departed from recognized standards for diagnosing the disease; and failed to adequately educate and inform his patients that his use of long-term antibiotics departed from recognized standards for treating Lyme disease. See Am. Compl. Ex. A. Based on these findings, the NCMB concluded that Jemsek's diagnosis and treatment practices constituted unprofessional conduct by failing to adhere to acceptable and prevailing standards of medical practice, and Jemsek's failure to explain his methods of diagnosis and treatment violated his patients' informed consent. Id. The NCMB suspended Jemsek's medical license for twelve months, a decision it stayed pending Jemsek's adherence to certain terms and conditions. Id. These terms and conditions restricted how Jemsek could treat Lyme-disease patients and barred him from using long-term antibiotics without pre-clearance. Am. Compl. ¶¶ 149, 155; see Am. Compl. Ex. A. After the NCMB issued the 2006 Order, Jemsek continued practicing medicine in North Carolina and complied with the 2006 Order's

4

requirements. Am. Compl. ¶ 167.

Jemsek alleges that the NCMB and former Board members initiated the NCMB's investigative process as part of a conspiracy to restrain Jemsek's medical practice by restricting the types of treatment he could administer to Lyme-disease patients to those treatments consistent with BCBSNC's policies. Id. ¶¶ 124, 126, 127, 133, 137, 138–39, 154–56, 165. According to Jemsek, the 2006 Order was the "byproduct" of the conspiracy. Id. ¶ 156. Jemsek also accuses defendant Dr. Rhyne—then a Board member—of spearheading the investigation and encouraging Board members to investigate Jemsek because Dr. Rhyne consulted on BCBSNC's Lyme-disease policy. Id. ¶¶ 105, 107, 115–16, 121–24.

In June 2007, the NCMB initiated a new investigation into Jemsek's use of hyperbaric chambers to treat Lyme-disease patients. Id. ¶ 172. The NCMB and former Board members communicated to Jemsek through his attorney that the NCMB would not pursue the new investigation or further discipline if Jemsek allowed his North Carolina medical license to lapse or become inactive. Id. ¶ 174. In response, Jemsek placed his North Carolina license on inactive status. Id. ¶ 177. Jemsek alleges that the NCMB conspired to violate the Sherman Act by offering to forego further disciplinary actions in exchange for Jemsek letting his license lapse or placing it on inactive status. Id. ¶¶ 167, 175, 177.

On June 23, 2008, the NCMB issued a "Public Letter of Concern" (the "2008 Letter"). Id. ¶ 179; Am. Compl. Ex. B. The 2008 Letter—a public record—represented the conclusion of the NCMB's inquiry in Jemsek's use of hyperbaric chambers to treat Lyme-disease patients. See Am. Compl. Ex. B. The 2008 Letter noted that Jemsek failed to supervise his nurse practitioners consistent with regulations, used a form of treatment "non-indicated for Lyme disease," and did so after being ordered to stop using long-term antibiotics, which the NCMB had also found to fall

5

below acceptable and prevailing standards of medical practice. See id. Jemsek alleges that defendants' aim in issuing the 2008 Letter was to restrain trade and prevent Jemsek from practicing medicine in North Carolina and elsewhere. Am. Compl. ¶¶ 180–82, 190.

B.

On September 9, 2014, Jemsek sued the NCMB and some of its current and former Board members alleging that in issuing the 2006 Order and 2008 Letter defendants violated his right to due process under the United States Constitution. See Jemsek v. State of North Carolina, (Jemsek I) No. 5:14-CV-504-BO, (E.D.N.C. Sep. 9, 2014) [D.E. 1]. He sought a declaration that the NCMB's 2006 Order and 2008 Letter were null, void, and unconstitutional, and a mandatory injunction directing the current Board members to rescind the 2006 Order and 2008 Letter. See id.; Order, Jemsek I, No. 5:14-CV-504-BO (E.D.N.C. Mar. 23, 2015) [D.E. 65] 7–8.

On March 23, 2015, the Honorable Terrence W. Boyle granted defendants' motion to dismiss. The court held that the Eleventh Amendment barred Jemsek's claims against the NCMB and his official-capacity claims against the Board-member defendants. Order, Jemsek I, No. 5:14-CV-504-BO (E.D.N.C. Mar. 23, 2015) [D.E. 65] 6–9. In doing so, the court explained that the relief sought was "clearly retrospective" because the claim for declaratory relief "addresse[d] alleged wrongs that occurred entirely in the past," and the claim for injunctive relief "relate[d] only to the consequences of actions in the past." Id. As for Jemsek's individual-capacity claims against the former Board members, the court observed that Jemsek lacked standing to pursue those claims against the former Board members because a favorable judgment would not redress his alleged harms. Id. at 8–9. As the court stated: "the past board members would have no authority to comply with an injunction and a declaratory judgment would have no legal effect on these individuals." Id. at 9.

6

Jemsek appealed. On October 13, 2016, the Fourth Circuit affirmed the dismissal. Jemsek v. Rhyne. (Jemsek I Appeal), No. 15-1420, 2016 WL 5940315 (4th Cir. Oct. 13, 2016) (unpublished).

C.

On February 2, 2016, Jemsek sued the NCMB and various former and current Board members (collectively, "defendants") in both their individual and official capacities [D.E.1]. On March 9, 2016, Jemsek filed an amended complaint [D.E. 66]. Jemsek alleges that defendants conspired to violate the Sherman Act by: (a) restricting Jemsek's trade by "maintaining of record and in full force and effect the 2006 Order and the 2008 [L]etter"; (b) "engaging in price fixing by restricting the types of medical services" physicians can offer to Lyme-disease patients so that the cost of such services comports with BCBSNC's price schedules; (c) continuing the monopoly created by the existence of the 2006 Order, which prevents Jemsek from providing services other than those provided or potentially provided by the Board members; and (d) "continuing in full force and effect the coerced inactive status of [Jemsek's] license, and upon information and belief, refusing in advance to remove the same upon [Jemsek's] application." Am. Compl. ¶ 233; see also id. ¶ 236. He also alleges that defendants currently violate the Sherman Act (and will in the future) by "perpetuat[ing] into the future . . . the continued existence" of the 2006 Order and 2008 Letter. Id. ¶ 238.

As relief, Jemsek seeks: (a) an injunction enjoining the Board-member defendants from conspiring to violate the Sherman Act "by engaging in price fixing, market allocation and unfair trade practices through the use and under the color of the [2006 Order] and [2008 Letter]," id. ¶ 235; (b) an "affirmative mandatory injunction" enjoining the current Board members "from maintaining of record, causing to maintain of record, enforcing or causing to be enforced" the 2006 Order and

7

2008 Letter on the grounds they violate the Sherman Act, id. ¶ 236; and (c) a declaratory judgment declaring that the 2006 Order and 2008 Letter—"as well as the perpetuation, continuous enforcement and continuation of the same" by the current Board members—violate the Sherman Act, id. ¶ 241. See also id. ¶¶ 11–13.

On April 7, 2016, defendants moved to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(6) [D.E. 68] and filed a supporting memorandum [D.E. 69]. On May 26, 2016, Jemsek responded in opposition to the motion to dismiss [D.E. 74 & 75]. On June 13, 2016, defendants replied [D.E. 79].

## II.

Defendants move to dismiss on four grounds. First, that issue preclusion prevents Jemsek from relitigating the conclusion in Jemsek I that the Eleventh Amendment bars Jemsek's claims against the NCMB and official-capacity claims against the Board-member defendants. Second, that even if issue preclusion does not apply, the Eleventh Amendment bars these claims. Third, that Jemsek lacks standing to pursue his individual-capacity claims against the Board-member defendants because a favorable disposition will not redress his alleged harm. Finally, even if the court has jurisdiction, Jemsek fails to state a claim under the Sherman Act.

## A.

Defendants contend that issue preclusion prevents Jemsek from relitigating the conclusion in Jemsek I that the Eleventh Amendment bars Jemsek from suing the NCMB and current and former Board members in their official capacities in federal court. The court need not, however, address issue preclusion. Rather, assuming without deciding that issue preclusion does not apply, the Eleventh Amendment bars Jemsek from suing the NCMB and current and former Board members in their official capacities in federal court.

8

The Fourth Circuit has "been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." Andrews v. Daw, 201 F.3d 521, 525 n.2 (4th Cir. 2000). "[A] recent trend among the district courts within the Fourth Circuit [is] to consider sovereign immunity under Rule 12(b)(1)." Parks v. Commonwealth of Va. Dep't of Soc. Servs. Child Support Enf't Servs., No. 1:16-CV-568 (JCC/TCB), 2016 WL 4384343, at *2 (E.D. Va. Aug. 17, 2016) (unpublished). The distinction is not material where, as here, a defendant "contend[s] that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," in which case "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982); see Kerns v. United States, 585 F.3d 187, 192–93 (4th Cir. 2009). A court must deny the motion under Rule 12(b)(1) "if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Kerns, 585 F.3d at 192.

The Eleventh Amendment bars suit against non-consenting states by private individuals in federal court. Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001); see Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479 (4th Cir. 2005). In addition to the States themselves, the Eleventh Amendment shields non-consenting state agencies and departments from suits by private individuals in federal court. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Constantine, 411 F.3d at 479; Va. Hosp. Ass'n v. Baliles, 868 F.2d 653, 662 (4th Cir. 1989). "And for purposes of the Eleventh Amendment, a state official acting in his official capacity is protected from a damages action by the same immunity." Ballenger v. Owens, 352 F.3d 842, 845 (4th Cir. 2003). Under the doctrine of Ex Parte Young, 209 U.S. 123 (1908), however, "the Eleventh Amendment does not bar a suit against a State official for

9

prospective injunctive relief." Constantine, 411 F.3d at 496.

Initially, Jemsek contends that the Eleventh Amendment does not apply to his Sherman Act claims and that the NCMB and Board-member defendants are not immune under the antitrust state-action doctrine as applied in North Carolina Board of Dental Examiners v. Federal Trade Commission, 135 S. Ct. 1101 (2015). However, Eleventh Amendment immunity and antitrust state-action immunity are distinct defenses to alleged Sherman Act violations. See S.C. State Bd. of Dentistry v. FTC, 455 F.3d 436, 446 (4th Cir. 2006); TFWS, Inc. v. Schaefer, 242 F.3d 198, 203–06, 210–11 (4th Cir. 2001).[1]

The Eleventh Amendment bars Jemsek's claims against the NCMB. In his amended complaint Jemsek concedes that the NCMB is a state agency. Am. Compl. ¶ 14; see N.C. Gen. Stat. § 90-2; Manion v. N.C. Med. Bd., No. 5:16-CV-63-BO, 2016 WL 4523902, at *4 (E.D.N.C. Aug. 22, 2016) (unpublished). That Jemsek seeks only injunctive and declaratory relief makes no difference. The Ex parte Young exception "has no application in suits against the States and their agencies, which are barred regardless of the relief sought." P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993); see Pennhurst State Sch. & Hosp., 465 U.S. at 100; S.C. State Bd. of Dentistry, 455 F.3d at 447 n.8; S.C. State Ports Auth. v. Fed. Mar. Comm'n, 243 F.3d

---

[1] See also Rodgers v. La. Bd. of Nursing, No. 16-30023, 2016 WL 6608960, at *3–4 (5th Cir. Nov. 8, 2016) (per curiam) (unpublished); Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par., 171 F.3d 231, 234 (5th Cir. 1999); Neo Gen Screening, Inc. v. New England Newborn Screening Prog., 187 F.3d 24, 25–30 (1st Cir. 1999); Earles v. State Bd. of Certified Pub. Accountants of La., 139 F.3d 1033, 1034, 1036–42 (5th Cir. 1998); Charley's Taxi Radio Dispatch Corp. v. SIDA of Haw., Inc., 810 F.2d 869, 872–74 (9th Cir. 1987); Euster v. Eagle Downs Racing Ass'n, 677 F.2d 992, 993 & n.2 (3d Cir. 1982); Daniel v. Am. Bd. of Emergency Med., 237 F. Supp. 2d 336, 345 (W.D.N.Y. 2002); Pharm. & Diagnostic Servs., Inc. v. Univ. of Utah, 801 F. Supp. 508, 510–14, 516 (D. Utah 1990); Cowboy Book, Ltd. v. Bd. of Regents for Agric. & Mech. Colleges, 728 F. Supp. 1518, 1520 & n.2 (W.D. Okla. 1989); cf. Schopler v. Bliss, 903 F.2d 1373, 1378–79 (11th Cir. 1990); Univ. of Texas at Austin v. Vratil, 96 F.3d 1337, 1340 (10th Cir. 1996); Kinney v. State Bar of California, No. 16-CV-02277-MMC, 2016 WL 4502789, at *1 (N.D. Cal. Aug. 29, 2016) (unpublished).

165, 177 (4th Cir. 2001), aff'd, 535 U.S. 743 (2002). Tellingly, both the district court and Fourth Circuit in Jemsek I held that the Eleventh Amendment barred Jemsek's claims against the NCMB notwithstanding that he sought injunctive relief. Order, Jemsek I, No. 5:14-CV-504-BO (E.D.N.C. Mar. 23, 2015) [D.E. 65] 6–7; Jemsek I (Appeal), 2016 WL 5940315, at *3. The same conclusion applies here.

The Eleventh Amendment also bars Jemsek's claims against the Board-member defendants in their official capacities. Under Ex parte Young, a plaintiff generally may "seek[] prospective declaratory and injunctive relief against a state official for an ongoing violation of federal law" notwithstanding the Eleventh Amendment. Schaefer, 242 F.3d at 204. Determining Ex parte Young's applicability entails a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (quotation and alteration omitted). Thus, Ex parte Young's exception applies to "claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998).

Jemsek fails to plausibly allege any ongoing violation of federal law. Ex parte Young's exception "does not permit federal courts to entertain claims seeking retrospective relief, either compensatory or other, for completed, not presently ongoing violations of federally-protected rights." See id.; Al-Deen v. Trustees of Univ. of N.C., Wilmington, 102 F. Supp. 3d 758, 764 (E.D.N.C. 2015). The exception does not apply when "the actual violation alleged is a past event that is not itself continuing." Republic of Paraguay, 134 F.3d at 628; see Jemsek I (Appeal), 2016 WL 5940315, at *4. Put differently, the Ex parte Young exception "applies only when there is an

ongoing violation of federal law that can be cured by prospective relief. It does not apply when the alleged violation of federal law occurred entirely in the past." DeBauche v. Trani, 191 F.3d 499, 504–05 (4th Cir. 1999).

Although Jemsek's allegations lack consistency in describing when the alleged Sherman Act violations occurred, his amended complaint overwhelmingly alleges completed, not presently ongoing, violations of the Sherman Act. See, e.g., Am. Compl. ¶¶ 4–6, 154, 156, 165, 167, 167,[2] 171, 174–77, 180–82, 187, 190, 205, 207, 210, 211, 236. In his amended complaint Jemsek occasionally alleges that defendants currently violate the Sherman Act, but "the actual violation alleged is a past event that is not itself continuing." Republic of Paraguay, 134 F.3d at 627 (emphasis added). Essentially, Jemsek's alleges that the 2006 Order and 2008 Letter resulted from conspiracies to violate the Sherman Act, and that the continued failure to rescind or retract the 2006 Order and the 2008 letter constitute ongoing violations. Even assuming that to be true, the violation occurred when the NCMB issued the 2006 Order and 2008 Letter.

To the extent Jemsek alleges that defendants currently violate the Sherman Act, these allegations do not change the ultimate conclusion. Jemsek alleges that the current Board-member defendants presently violate the Sherman Act: by engaging in price fixing by restricting the types of services physicians can offer to Lyme-disease patients so that the cost of such services comports with BCBSNC's price schedules; by continuing the monopoly created under the 2006 Order, which prevents Jemsek from providing services other than those provided or potentially provided by the Board members; and by "continuing in full force and effect the coerced inactive status" of Jemsek's license. See Am. Compl. ¶¶ 233, 236. Jemsek, however, fails to plausibly allege that the current

---

[2] The amended complaint mistakenly contains two paragraphs numbered 167. The paragraphs allege conduct that occurred in 2006 and 2007.

Board members were either engaging in price fixing by restricting the types of services other physicians can provide to Lyme-disease patients or continuing a monopoly "at the time [Jemsek] filed [his] action." Republic of Paraguay, 134 F.3d at 628; see Jemsek I (Appeal), 2016 WL 5940315, at *4. Jemsek has not plausibly alleged that defendants are continuing to violate the Sherman Act "either by action or non-action." Republic of Paraguay, 134 F.3d at 628; see Jemsek I (Appeal), 2016 WL 5940315, at *4. Moreover, Jemsek could not plausibly allege that defendants are continuing to violate the Sherman Act. As the Fourth Circuit stated in Jemsek I, the 2006 Order and 2008 Letter "do[] not circumscribe [Jemsek's] current conduct." Jemsek I (Appeal), 2016 WL 5940315, at *4 n.5. "The NCMB merely conducted investigations that led to a suspended disciplinary order and a one-time letter of reprimand." Id. Furthermore, in Jemsek I, the Fourth Circuit rejected Jemsek's allegations that the current Board members are responsible for maintaining his inactive status: "Jemsek has not plausibly alleged that the Board 'is continuing to prevent [him], either by action or non-action, from' seeking to resume his medical practice in the state." Jemsek I (Appeal), 2016 WL 5940315, at *4 (quoting Republic of Paraguay, 134 F.3d at 628).

Having alleged only completed, not presently ongoing violations of the Sherman Act, Jemsek is left with one remaining allegation: that the current Board members have, "upon information and belief," "refused in advance to honor any attempts by [Jemsek] to" have his license reinstated to active status. Am. Compl. ¶¶ 219, 233. This allegation "amount[s] to conjecture regarding discrete future events" and "[m]ere conjecture is insufficient to transform a one-time event into a continuing governmental practice or an ongoing violation." DeBauche, 191 F.3d at 504–05; see Jemsek I (Appeal), 2016 WL 5940315, at *4. In his amended complaint, Jemsek does not allege that he has sought reinstatement, but that the Board would not honor Jemsek request to be reinstated if he made it. Such conjecture does not satisfy Ex parte Young. See Jemsek I (Appeal), 2016 WL 5940315, at

13

*4; DeBauche, 191 F.3d 499 at 505.

Finally, Jemsek's claims bear no semblance to those cases in which courts have found a continuing violation even though the violation stemmed from past state action. See, e.g., Papasan v. Allain, 478 U.S. 265, 282 (1986); Milliken v. Bradley, 433 U.S. 267, 288–90 (1977); CSX Transp., Inc. v. Bd. of Pub. Works of State of W.Va., 138 F.3d 537, 541–42 (4th Cir. 1998); Thomas S. v. Flaherty, 902 F.2d 250, 255 (4th Cir. 1990); Coakley v. Welch, 877 F.2d 304, 306–07 (4th Cir. 1989); McConnell v. Adams, 829 F.2d 1319, 1322, 1329–30 (4th Cir. 1987). In those cases, the current harm alleged "result[ed] directly from . . . actions in the past," but "the essence" of the claims was that the state continued to violate the law. See Papasan, 478 U.S. at 282; Republic of Paraguay, 134 F.3d at 628. Although the initial unlawful action occurred in the past, "at the time that those actions were filed, responsible state officials were presently violating the claimants' ongoing rights." Republic of Paraguay, 134 F.3d at 628. Jemsek, however, essentially claims that the 2006 Order and 2008 Letter violate the Sherman Act due to the circumstances under which they were issued. "What remains is simply a dispute about the lawfulness of [defendants'] past actions." Int'l Coal. for Religious Freedom v. Maryland, 3 F. App'x 46, 50 (4th Cir. 2001) (per curiam) (unpublished) (quotation omitted). Such a claim does not assert an ongoing violation of federal law under Ex parte Young. See Jemsek I (Appeal), 2016 WL 5940315, at *4; Int'l Coal. for Religious Freedom, 3 F. App'x at 50; DeBauche, 191 F.3d at 504–05; Republic of Paraguay, 134 F.3d at 628; Manion, 2016 WL 4523902, at *4; Al-Deen, 102 F. Supp. 3d at 764–65.

Even had Jemsek plausibly alleged an ongoing Sherman Act violation, Ex parte Young would still not save his claim because the relief he seeks is inherently retrospective, and Ex parte Young "does not permit judgments against state officers declaring that they violated federal law in the past." Puerto Rico Aqueduct & Sewer Auth., 506 U.S. at 146; see Jemsek I (Appeal), 2016 WL 5940315,

14

at *3; Al-Deen, 102 F. Supp. 3d at 764–65. The exception does not apply "when the essence is considered, the only presently effective relief sought for the violations claimed . . . is quintessentially retrospective." Republic of Paraguay, 134 F.3d at 628. Relief is retrospective when the effect of an injunction or declaration directed at state officials "would be to undo accomplished state action and not to provide prospective relief against the continuation of the past violation." Id.; see Jemsek I (Appeal), 2016 WL 5940315, at *4; Int'l Coal. for Religious Freedom, 3 F. App'x at 51; Manion, 2016 WL 4523902, at *4; Al-Deen, 102 F. Supp. 3d at 764–65. Additionally, that Jemsek seeks only injunctive and declaratory relief does not per se place his claims within Ex parte Young. See Jemsek I (Appeal), 2016 WL 5940315, at *4. Retrospective relief, "either compensatory or other, for completed, not presently ongoing violations of federally-protected rights," does not fall within the exception. Republic of Paraguay, 134 F.3d at 627–28 (emphasis added).

Jemsek seeks the following relief: (a) an injunction enjoining the Board-member defendants from conspiring to violate the Sherman Act "by engaging in price fixing, market allocation and unfair trade practices through the use and under the color of the [2006 Order] and [2008 Letter]," Am. Compl. ¶ 235; (b) an "affirmative mandatory injunction" enjoining the current Board members "from maintaining of record, causing to maintain of record, enforcing or causing to be enforced" the 2006 Order and 2008 Letter on the grounds they violate the Sherman Act, id. ¶ 236; and (c) a declaratory judgment declaring that the 2006 Order and 2008 Letter—"as well as the perpetuation, continuous enforcement and continuation of the same" by the current Board members—violate the Sherman Act. Id. ¶ 241; see also id. ¶¶ 11–13.

Jemsek does not seek prospective relief. None of his remedies are "designed to end a continuing violation of federal law." Green v. Mansour, 474 U.S. 64, 68 (1985); see Int'l Coal. for Religious Freedom, 3 F. App'x at 50; Lynn v. West, 134 F.3d 582, 588 (4th Cir. 1998); Al-Deen,

102 F. Supp. 3d at 764–65. There exists "no occasion to issue an injunction because the state action is past and an injunction would serve no purpose." Int'l Coal. for Religious Freedom, 3 F. App'x at 50. The United States District Court for the District of Massachusetts's decision in Caesars Massachusetts Development Company, LLC v. Crosby, No.13-13144-NMG, 2014 WL 2468689 (D. Mass. May 30, 2014) (unpublished), aff'd, 778 F.3d 327 (1st Cir. 2015), is informative on this point. In Caesars, plaintiffs failed to successfully navigate Massachusetts's process for casino licensing. Id. at *1. The licensing process resulted in a Suitability Report declaring plaintiffs unsuitable to operate a casino in the state. Id. Believing that the process had been rigged, plaintiffs sued state officials for due-process and equal-protection violations. Id. Plaintiffs sought a declaration that the Suitability Report was null and void and an injunction barring defendants from disseminating the report in the future. Id. Plaintiffs argued that the requested relief was prospective because they sought "to remedy the on-going harm caused by the fact that [the] defendants continue[d] to disseminate and rely upon the constitutionally flawed report." Id. at *7. Because plaintiffs alleged no ongoing violation of federal law "but, rather, at most a past violation the record of which continues to be available and have ongoing effects," the requested relief could not "ensure future compliance with a substantive legal question." Id. Thus, the requested relief was impermissibly retrospective under Ex parte Young. See id.

These principles apply to Jemsek's claims. Jemsek seeks relief that is "retrospective in nature" because "it relates not to 'ongoing violations of federal law' but rather to 'continued effects' and 'by-products' of past action." Manion, 2016 WL 4523902, at *4 (quoting Crosby, 2014 WL 2468689, at *8). Absent an ongoing violation of federal law, the "inescapable fact" is that the effect of Jemsek's sought-after relief "would be to undo accomplished state action." Republic of Paraguay, 134 F.3d at 628. Accordingly, the Eleventh Amendment bars Jemsek's claims against the NCMB

16

and his official-capacity claims against the Board-member defendants.

### B.

Defendants contend that Jemsek lacks Article III standing to pursue his individual-capacity claims against either the former or current Board members.[3] To invoke the power of a federal court, a plaintiff must demonstrate that he has standing under Article III of the Constitution. Absent such standing, the court lacks subject-matter jurisdiction to hear plaintiff's claim. See White Tail Park, Inc. v. Stroube, 413 F.3d 451, 458–59 (4th Cir. 2005). For Article III standing, "[t]he party invoking federal jurisdiction bears the burden of establishing" (1) a concrete and particularized, actual or imminent injury-in-fact, (2) that is fairly traceable to the defendant's actions, and (3) that is redressable by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); see Doe v. Obama, 631 F.3d 157, 160 (4th Cir. 2011). For an injury to satisfy the redressability prong, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at 561 (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38 (1976)); see United States v. Batato, 833 F.3d 413, 422 (4th Cir. 2016).

Jemsek's individual-capacity claims for injunctive relief fail for lack of redressability because the Board-member defendants lack authority to comply with an injunction in their individual capacities. To comply with the proposed injunction the Board-member defendants would have to act in their official capacities. See, e.g., Kobe v. Haley, No. 3:11-1146-TMC, 2012 WL 3269221, at *7 (D.S.C. Aug. 10, 2012) (unpublished); Smith v. Plati, 56 F. Supp. 2d 1195, 1203 (D. Colo.

---

[3] In opposing defendants' motion to dismiss, Jemsek does not address their Article III standing arguments. Instead, Jemsek argues that he can maintain his individual-capacity claims because he satisfies the requirements for "antitrust standing." [D.E. 75] 24–25. But antitrust standing is an additional requirement that an antitrust plaintiff must satisfy beyond establishing Article III standing. Novell, Inc. v. Microsoft Corp., 505 U.S. 302, 310 (4th Cir. 2007); DataCell ehf. v. Visa, Inc., No. 1:14-CV-1658 GBL/TCB, 2015 WL 4624714, at *6 (E.D. Va. July 30, 2015) (unpublished).

1999); DeLoreto v. Ment, 944 F. Supp. 1023, 1031 (D. Conn. 1996). As individuals, they lack authority to comply with an injunction to remove the 2006 Order and 2008 Letter from the books, to enforce them, or to deny Jemsek's application to return his license to active status. Accordingly, redressability is absent. Notably, in Jemsek I, the Fourth Circuit implicitly acknowledged that Jemsek lacked standing to pursue these individual-capacity claims. See Jemsek I (Appeal), 2015 WL 4624714, at *2 (stating that "[i]t could not be otherwise" when observing that Jemsek dropped all but his official-capacity claims for injunctive relief against the current Board members).

Jemsek also lacks standing to pursue his claims for declaratory relief against the Board-member defendants in their individual capacities because such relief would not redress any alleged injury. As the district court concluded in Jemsek I, "a declaratory judgment would have no effect" on the former Board members in their individual capacities. Order, Jemsek I, No. 5:14-CV-504-BO (E.D.N.C. Mar. 23, 2015) [D.E. 65] 9. The same conclusion applies to the current Board members. In reasoning that Jemsek dropped his individual-capacity claims against the current Board members, the Fourth Circuit in Jemsek I stated that "[a]ny effort to seek declaratory relief from the current Board members in their individual capacities would fail to state a claim because such a declaration would have no legal effect on those individuals." Jemsek I (Appeal), 2015 WL 4624714, at *2. Thus, Jemsek lacks standing to pursue his individual-capacity claims for declaratory relief.

Alternatively, Jemsek would still lack standing even if he could pursue his claims for declaratory relief against the Board-member defendants in their individual capacities. "By itself, a declaratory judgment cannot be the redress that satisfies the third standing prong." Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Labor, 995 F.2d 510, 513 (4th Cir. 1993); see Jemsek I (Appeal), 2015 WL 4624714, at *3. Because Jemsek lacks standing to pursue his individual-capacity claims for injunctive relief, he cannot rely solely on his claim for declaratory

18

relief to establish standing.

Finally, lack of standing—specifically lack of redressability—offers another grounds for dismissing Jemsek's official-capacity claims against the former Board members. The Fourth Circuit in Jemsek I analyzed Jemsek's standing to pursue declaratory and injunctive relief against the former Board members in their official capacities. See Jemsek I (Appeal), 2015 WL 4624714, at *2–3 (stating that Jemsek dropped his individual-capacity claims and that the court would "proceed to address his arguments involving current and former Board members in their official capacities"). The Fourth Circuit held that "whatever authority the former Board members had at the time of the 2006 order and the 2008 letter, they have none now." Id. at 3. Thus, Jemsek's claim for injunctive relief could not be enforced against the former Board members in their official capacities. Id. That left only his claim for declaratory relief, which by itself (even if available) could not establish redressability. Id. The same conclusion applies here because the relief Jemsek seeks can be executed only by those currently serving on the NCMB. Accordingly, Jemsek lacks standing to seek either injunctive or declaratory relief against the former Board members in their individual capacities, the current Board members in their individual capacities, and the former Board members in their official capacities.

III.

Alternatively, Jemsek fails to state a claim for violation of the Sherman Act. A motion to dismiss under Rule 12(b)(6) tests the legal and factual sufficiency of the complaint. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). The court "accepts all well-pled facts as true and construes

these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). The court need not, however, accept as true a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Id.

The analytical framework known as the "rule of reason" applies to the restraints Jemsek alleges. See Petrie v. Va. Bd. of Medicine, 648 F. App'x 352, 356 (4th Cir. 2016) (unpublished). Courts apply the rule of reason when "the reasonableness of a restraint cannot be determined without a thorough analysis of its net effects on competition in the relevant market." Cont'l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 509 (4th Cir. 2002). Under the rule of reason, Jemsek must prove that defendants' actions have unreasonably restrained trade. Oksanen v. Page Memorial Hosp., 945 F.2d 696, 709 (4th Cir. 1991).

Jemsek fails to plausibly allege the second of the two prongs required to make out a Sherman Act violation: "(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002). "[T]he reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." Oksanen, 945 F.2d at 708. "[A] plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury." Id.; see Petrie, 648 F. App'x at 356. Jemsek, however, alleges only an injury to himself, not an injury to competition. See Am. Compl. ¶¶ 181, 182, 186–89, 192, 199.

Petrie v. Virginia Board of Medicine, 648 F. App'x 352 (4th Cir. 2016) (unpublished), illustrates this principle. Patients of Petrie, a Virginia chiropractor, lodged complaints with the Virginia Board of Medicine alleging that Petrie falsely "pass[ed] herself off as a diabetes and thyroid specialist" and "held herself out as a medical doctor in order to mislead" patients into believing she

was a medical professional qualified to administer a certain fat-burning procedure. Id. at 354 (quotation omitted). After a hearing, the Board issued an order finding that Petrie had violated various state statutes and regulations governing the practice of chiropractic care. Id. The Board sanctioned Petrie by suspending her license for six months and fining her $25,000.00. Id.

While Petrie's appeal of the Board's decision was pending in state court, Petrie "initiated another effort to overturn the Board's order against her" by suing the Board, its executive director, and five of its members in federal district court for Sherman Act violations. Id. at 353–54. Petrie alleged "that the Board's order reflect[ed] a conspiracy to exclude chiropractors from certain markets for medical services." Id. at 354. "Notably," she did not allege that Virginia's statutory licensing scheme or scope of practice violated the Sherman Act. Id. Instead, the "crux" of Petrie's complaint was that the Board's order sanctioning her "constituted a power grab by [m]edical doctors and doctors of osteopathy who have financial incentives to limit the scope of practice of competitors." Id. at 354–55 (quotations omitted) (alteration in original). Essentially, Petrie's claim amounted to an allegation that "the Board's members conspired to adopt an improper interpretation of the Virginia statutes that define the scope of chiropractic, for the purpose of stifling competition between chiropractors and other medical professionals." Id. at 355.

The district court granted the Board's motion for summary judgment, holding that Petrie failed to show an unreasonable restraint on trade because she "show[ed] no anticompetitive effects on the relevant market." Id. at 356. The Fourth Circuit affirmed. Id.

The Fourth Circuit first addressed "whether the Board's order against Petrie constitute[d] 'an unreasonable restraint of trade.'" Id. "Because the antitrust laws were designed to protect competition, not competitors, the elimination of a single competitor standing alone, does not prove the anticompetitive effect necessary for a Sherman Act violation." Id. (quotation and alterations

21

omitted). Although the Board's order against Petrie injured Petrie herself, "a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic harm." Id. (quoting Oksanen, 945 F.2d at 708).

To avoid this principle, Petrie cast her injury as one affecting all Virginia chiropractors by alleging that "[t]he Board used [her] as a springboard to eliminate an entire class of competitors . . . for improper purposes." Id. (quotation omitted). Similar to Jemsek, Petrie also alleged that "but for the Board's anticompetitive conduct, Dr. Petrie and other doctors of chiropractic would compete or have the potential to compete with the Board's members to offer the sorts of services that the Board sanctioned Petrie for having offered." Id. (quotation and alteration omitted). The Fourth Circuit rejected the argument and held that Petrie's allegations failed to establish an anticompetitive effect:

> Petrie, however, has been unable to present any specific evidence that the Board's order against her has had the broader effects she posits. The record is completely devoid of evidence that any other Virginia chiropractor has sought to provide laser fat removal services or the other services the Board sanctioned Petrie for providing, or that any other Virginia chiropractor was providing those services and ceased doing so after the Board sanctioned Petrie. Instead of providing actual evidence of negative effects on competition between chiropractors and medical doctors, Petrie simply speculates that the Board's order against her could have had such effects. But mere speculation is not enough to withstand a motion for summary judgment. Accordingly, we affirm the district court's holding that Petrie failed to show that the Board imposed an unreasonable restraint of trade by sanctioning Petrie for her violations of the Virginia laws governing the practice of chiropractic.

Id. at 356–57.

These conclusions all apply to Jemsek's allegations concerning providers of Lyme-disease treatments. Petrie's claim failed at summary judgment because she had forecast no evidence establishing an injury to anyone but herself. See id. Jemsek's claim is even weaker than Petrie's claim because Jemsek fails to allege any anticompetitive effect whatsoever. See Am. Compl. ¶¶ 2, 3, 7, 8, 11, 167, 180, 181, 182, 192, 213, 235, 236, Prayer for Relief. Jemsek's only allegations

22

regarding an effect on competition at large, as opposed to just on himself, amount to his conclusory restatements of the elements of a Sherman Act claim. See id. ¶¶ 31, 138, 186. Jemsek's bare allegations are mere legal conclusions without factual support. See id. Having failed to plausibly allege an anticompetitive effect, Jemsek fails to state a claim for violation of the Sherman Act. See, e.g., Patel v. Scotland Memorial Hosp., 91 F.3d 132, at *4 (4th Cir. 1996) (per curiam) (unpublished table decision); Mountain State Mech. Insulation, Inc. v. Bell Constructors, LLC, No. 1:11CV180, 2012 WL 2995213, at *5 (N.D. W. Va. July 23, 2012) (unpublished); Jadali v. Alamance Reg'l Med. Ctr., 225 F.R.D. 181, 184–85 (M.D.N.C. 2004); see also Estate Constr. Co. v. Miller & Smith Holding Co., Inc., 14 F.3d 213, 221–22 (4th Cir. 1994). In light of this conclusion, the court need not address defendants' argument that Jemsek fails to plausibly allege a relevant market.

## IV.

In his response in opposition to defendants' motion to dismiss, Jemsek requests leave to amend his complaint should the court "not deem the allegations of the complaint sufficient." [D.E. 75] 28–30. He seeks to "to cure any deficiencies identified by the Court." Id. at 29–30.

A party generally may amend its complaint once as a matter of course. Fed. R. Civ. P. 15(a)(1). On March 9, 2016, Jemsek did so [D.E. 66]. Further amendments are allowed "only with the opposing party's written consent or the court's leave," although "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A court properly denies a plaintiff's request to amend the complaint "where, as here, the plaintiff fails to formally move to amend and fails to provide the district court with any proposed amended complaint or other indication of the amendments he wishes to make." Estrella v. Wells Fargo Bank, N.A., 497 F. App'x 361, 362 (4th Cir. 2012) (per curiam) (unpublished). Moreover, under Rule 7(b)(1) of the Federal Rules of Civil Procedure, "[a] request for a court order must be made by motion." A responsive brief is not an

appropriate means to request leave to amend a complaint. See Drager v. PLIVA USA, Inc., 741 F.3d 470, 474–75 (4th Cir. 2014); Francis v. Giacomelli, 588 F.3d 186, 197 (4th Cir. 2009); Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 630 (4th Cir. 2008). Because Jemsek did not file a motion to amend and a proposed amended complaint, the court denies the "request" in his responsive brief for leave to amend his complaint. See U.S. ex rel. Walterspiel v. Bayer AG, 639 F. App'x 164, 168 (4th Cir. 2016) (per curiam) (unpublished); Marks v. Dann, 600 F. App'x 81, 89 (4th Cir. 2015) (unpublished); Discovery Commc'ns, LLC v. Computer Scis. Corp., 570 F. App'x 306, 307 (4th Cir. 2014) (per curiam) (unpublished); Drager, 741 F.3d at 474–75; Estrella, 497 F. App'x at 362; Francis, 588 F.3d at 197; Cozzarelli, 549 F.3d at 630.

V.

In sum, the Eleventh Amendment bars Jemsek's claims against the NCMB and Board-member defendants in their official capacities, and Jemsek lacks standing to pursue his individual-capacity claims against the current Board members and his individual-capacity and official-capacity claims against the former Board members. Alternatively, Jemsek fails to state a claim upon which relief can be granted for violation of the Sherman Act. Accordingly, the court GRANTS defendants' motion to dismiss [D.E. 68]. The clerk shall close the case.

SO ORDERED. This _20_ day of February 2017.

JAMES C. DEVER III
Chief United States District Judge